## Neel *et al. v.* Blythe *et al.*

### (District Court, W. D. Pennsylvania. May 29, 1890.)

1. **Collision—Vessels Torn from Moorings—Floods—Inevitable Accident.**
   During a sudden and extraordinary flood in the Monongahela river, the defendants' fleet of water-craft was torn from its moorings at night, and carried down stream, and, it was charged, collided with and damaged the libelants' coal-boats. Upon the facts disclosed by the proofs, *held,* that the case was one of inevitable accident.

2. **Same—Diligence.**
   There being no such particular relation between the libelants and the defendants as imposed upon the latter any special obligation, they were not bound to exercise more than ordinary prudence, skill, and diligence to hold their fleet.

3. **Same.**
   The highest degree of caution that could be used was not required of the defendants.

In Admiralty. Libel *in personam.*
*D. T. Watson* and *Knox & Reed,* for libelants.
*D. F. Patterson* and *T. H. Baird,* for respondents.

Acheson, J. I shall not discuss the question of jurisdiction, but, following the later decisions, will regard the case as one cognizable in a court of admiralty, and proceed at once to a consideration of the merits of the controversy. The libel charges, in substance, that the defendants' fleet of water-craft and rafts of timber,—composed of three barges, five coal-boats, a flat-boat, and several rafts,—which was lying in the Monongahela river at Monongahela City, was improperly, negligently, and insufficiently moored and tied up, and that by reason of negligence in that regard said fleet broke away from its moorings about 11 o'clock on the night of July 10, 1888, and, drifting down the river, came into collision with, and thereby sunk and damaged, thirteen coal-boats belonging to the libelants, which were lying in the river 200 feet below, well and securely moored to the shore. Upon a careful examination of the voluminous proofs, I find the material facts to be as follows: The defendants'

fleet was moored at their own private landing, which was in all respects a proper and safe place for mooring water-craft. At the head of the landing were four abutments, the tops of the tying posts of which were as high as the highest point on the river bank at that place. The fleet lay immediately below these abutments, and was secured thereto by a chain and five lines, which ran from the posts on the tops of the three outer abutments to different points on the head of the fleet. There were also two lines attached to the lower part of the fleet, and extending to a post on the shore up stream, and a further line tied to the inside barge, and running to an abutment in front of the defendants' planing-mill. This was the condition of affairs on the morning of July 9, 1888, when the river began to swell. Then, on the afternoon of that day, still another line was run from the inside post of abutment No. 2 to one of the rafts, and thence to the outside barge. All these lines were reasonably good and suitable, such as are ordinarily employed for the like purpose and under like circumstances. There had been no unusual local rain-fall, and no considerable rise was looked for by the defendants or others at Monongahela City. The rise, indeed, came mainly from the head-waters of the river; and, even after it began at Monongahela City, the height to which the water eventually there rose was altogether unforeseen. Mr. Ford, a man of experience, who assisted in putting additional lines on the defendants' fleet, testifies that on Tuesday, July 10th, he had no idea that the water would come to within 10 feet of the point it ultimately attained; and H. L. Abrams, who has had personal knowledge of the river for many years, testifies:

"It was the greatest rise we ever had, and the most deceptive rise,—kept on rising when everybody thought it had quit; and it kept on."

On July 10th, (Tuesday,) especially during the afternoon, some of the defendants, with a large force of employes, were engaged constantly in putting out additional lines to shore, tightening up the lines so as to keep an equal strain on them, breasting in the fleet, and doing whatever else seemed to them to be necessary for its security. Probably, altogether, there were as many as 15 men so employed, and those who had oversight of the work were at least of average experience and skill in such matters. On the morning of that day another inch and a half line was put out from the abutment near the logway of the planing-mill to the lower part of the fleet, and a stern line was run thence to a post on shore; and later in the day three other suitable lines were run from the lower part of the fleet, and fastened to shore. Then, some time after 2 o'clock in the afternoon, the defendants borrowed a new or nearly new two-inch line from Lewis Staib, and it was tied to a walnut tree which stood on the river bank a short distance above the head of the fleet, and was run and fastened to two of the rafts in the upper part of the fleet. Furthermore, several lines—four of them each an inch and a half thick—were run, some from a pear tree, and some from a cherry tree, on the river bank, and made fast to the upper part of the fleet. The walnut, pear, and cherry so used were live, sound trees; the

former being of the diameter of about 15 inches, and the pear and cherry each of the diameter of from 10 to 12 inches. These trees, and particularly the walnut, had been used for tying fleets for a number of years by the defendants and their predecessors in business. According to the clear weight of the evidence, all the lines so put out on Tuesday, except the one stern line, ran, with respect to the river, at an angle of about 45 deg., and thus operated as head-lines to hold the fleet up against the current, while tending at the same time, also, to breast the fleet into shore. Late in the afternoon (in consequence, it would seem, of a suggestion made by James Neel, one of the libelants) the defendants borrowed from the railroad company two two-inch lines, which they tied together, so as to give sufficient length, and the line was made fast to a cherry tree near the railroad, and the other end fastened to the upper part of the fleet as a breast-line, and a twister was put in the line, and used to draw the fleet in towards the shore.

Besides the suddenness of the rise, the flood was extraordinary in other respects. The water reached a height above that of any former flood of which there is any record or knowledge. The force of the current, too, was unusual; attaining on Tuesday, the witnesses declare, a velocity of from eight to ten miles an hour. The drift, also, was remarkable, both in quantity and composition. Besides the more usual things, the witnesses mention flats, coal-boats, barges, rafts, coal-tipples, bridges, out-buildings, and "large trees taken out by the roots" as being swept down stream. During Tuesday a great quantity of drift-wood, such as stumps, logs, etc., accumulated above the defendants' four abutments, and by the afternoon it had become a solid mass, piled up against the abutments. At 6 o'clock on Tuesday evening the water was over the tops of these abutments, and it had risen probably as much as four or five feet more by 10 or 11 o'clock that night, when the catastrophe under investigation occurred. It was then very dark, and those nearest could not see what took place. Only one of the witnesses claims to have been able to distinguish objects, and he states that he saw one of the defendants' barges strike the libelants' fleet. Several witnesses, who were favorably situated for hearing, testify that they first heard, apparently at the head of the defendants' fleet, a great crash,—"like two heavy bodies coming together," one describes it,—which was immediately followed by the snapping of lines; the difference between the sound of the crash and that of the breaking of the lines which ensued being quite distinguishable. Capt. Wilson Layman, a witness for the libelant, who was on board the steamer Stella, which was tied to the outside of the libelants' fleet, the head of which fleet was 200 feet below the foot of defendants' fleet, states that he heard "the crash above," and some one hallooing, "Here she goes!" and that about the same time he heard "lines snapping and cracking up about the mill;" and that very shortly afterwards, not more than a minute or two, he heard a crash into the libelants' fleet. He says he thought it was the defendants' fleet that struck the libelants' fleet; but he adds: "I could not say, it was so dark." Whatever may have been the immediate cause of the disaster

which befell the libelants, it is certain that the two fleets were swept away at nearly the same time ; the defendants' fleet moving first, and the libelants' fleet moving very soon afterwards.

The rise continued during the night; the flood not reaching its extreme height until the next morning. As indicating how "the waters prevailed" then, mention may here be made of the fact, stated by Mr. Neel, that the flood stood ten feet up on the trunks of the two Yohe pear trees, of which we shall soon have occasion to speak. After daylight it was discovered that the mass of drift which had been above the abutments was gone, and it also appeared that the walnut tree and pear tree and the cherry on the river bank to which lines were tied, had been pulled out by the roots, and carried off bodily. The cherry up at the railroad was standing; the line attached to it having parted.

Now, the defendants maintain that the crash first heard by the witnesses was occasioned by the great mass of drift coming over the tops of the abutments, and striking the head of their fleet; and that this mass, sweeping onward, was the immediate cause of a common disaster to the two fleets. Certainly, there are circumstances among those heretofore narrated which well comport with the theory that the defendants' fleet was thus broken up and turned loose; and if, indeed, that body of driftwood, rising with the water, came over the abutments, and was driven against the head of the defendants' fleet, it is very difficult to conceive how the loss here in question could have been averted by any precautionary measures open to the defendants. But the libelants, denying the soundness of the above hypothesis, insist that the loss they suffered was due to the culpability of the defendants in at least two particulars. It is shown that two large pear trees stood in the lot of "Yohe Brothers," a short distance above the walnut, and a little further in from the river than it stood, which trees for a long time had been used in high floods for tying fleets which lay at the defendants' landing; and it is asserted that the failure to use those pear trees on this occasion was a serious and inexcusable fault. Again, it is alleged that the defendants' fleet was not properly breasted into the shore, but was unnecessarily and negligently left exposed to the force of the current. To substantiate these charges, the libelants examined a number of witnesses. Such of them as are experts express the opinion that the defendants should have fastened headlines to the Yohe pear trees; and they further say that the lines to the abutments should have been loosened, in order that the fleet might have swung or been drawn into the shore as the river rose; while at least one of these witnesses states that it would have been still better had the lines to the abutments been thrown off altogether. On the other hand, the defendants have shown that the Yohe pear trees had become rotten inside, and that their tap-roots had rotted away,—facts tending to the conclusion that those trees were no longer entirely safe for tying purposes; and then the witnesses on the part of the defense testify that in fact the defendants' fleet was properly breasted into the shore, and, indeed, as far in as the piles of timber and the oakum house on the river bank would allow.

After the most patient study of the evidence, I am not convinced that the defendants were guilty of culpable negligence in any particular whatever. If it be conceded that the direct cause of the libelants' loss was the collision charged, still, under the proofs, it was, in my judgment, a case of inevitable accident, within the rule in admiralty. *The Austria,* 14 Fed. Rep. 298. The rule is thus declared by the supreme court, even in respect to a vessel moving under the control and guidance of a master, officers, and crew:

"Inevitable accident is where a vessel is pursuing a lawful avocation in a lawful manner, using the proper precautions against danger, and an accident occurs. The highest degree of caution that can be used is not required. It is enough that it is reasonable under the circumstances, such as is usual in similar cases, and has been found by long experience to be sufficient to answer the end in view,—the safety of life and property." *The Grace Girdler,* 7 Wall. 196, 203.

The witnesses who condemn the defendants speak with the wisdom that comes after the event. But the defendants are to be judged with reference to the extraordinary circumstances in which they found themselves. They were called upon to act in an emergency, and had to face perils unexpected, and increasing to the end. The situation was one of surprises. Certainly, the choice of trees to tie to was a matter for the exercise of mere good judgment, and a mistake here would not justly subject the defendants to a charge of carelessness. *Brown* v. *French,* 104 Pa. St. 604. Their own property was at stake, and they were moved by the powerful stimulus of self-interest to do whatever was possible to save their fleet. It is not to be doubted that to that end they gave their very best endeavors. The defendants stood in no such particular relation to the libelants as imposed upon them any special obligation; and assuredly they were not bound to exercise more than ordinary prudence, skill, and diligence. Shear & R. Neg. § 22. That they conformed, at least, to that standard of duty, I have no hesitation in holding. Let a decree be drawn dismissing the libel, with costs.