## McCauley et al. *v.* Logan, Appellant.

[Marked to be reported.]

*Negligence—Extraordinary accidents.*

One is responsible for such consequences of his fault as are natural and probable, but if his fault happens to concur with something extraordinary, and therefore not likely to be foreseen, he will not be answerable for the unexpected result.

*Extraordinary flood in river—Breaking loose of boats.*

Plaintiffs, bridge builders, erected false works in a river in the course of the erection of a bridge. Defendant, a lumber merchant, had a lumber yard twenty miles up the river from plaintiffs' false works. On the night of an extraordinary flood two boats belonging to defendant were tied to the bank a short distance above his yard, and during the night the outside one became detached, floated down the river and injured plaintiffs' works. There was no evidence that defendant had any knowledge of the existence of plaintiffs' works. The testimony on both sides showed that the river was only at an ordinary stage during the day preceding the accident, and that it had not been raining in the vicinity. The river rose, between nine o'clock in the evening and five o'clock in the morning, from eight to twelve feet, and all the witnesses testified that this was an unusual and extraordinary rise. The evidence showed that one lashing was sufficient to hold the boat in an ordinary stage of the water or in a very slight rise, but it appeared that the two boats were tied together by four lashings, and that the outer boat held its place until the flood was near its highest. *Held*, that plaintiffs were not entitled to recover and that the case should have been taken from the jury.

Argued Oct. 28, 1892. Appeal, No. 86, Oct T., 1892, by defendant, Alex. W. Logan, trading as J. W. Logan & Sons,

from judgment of C. P. Allegheny Co., Sept. T., 1890, No. 515, on verdict for plaintiffs, David McCauley et al. Before PAXSON, C. J., STERRETT, GREEN, WILLIAMS, McCOLLUM, MITCHELL and HEYDRICK, JJ.

Trespass for injury to false works of bridge.

The facts appear by the opinion of the Supreme Court.

The court, COLLIER, J., refused defendant binding instructions. [1]

Verdict and judgment for plaintiffs for $2,332.15.

Defendant appealed.

*Error assigned*, inter alia, was refusal of instructions, quoting point.

*H. T. Watson*, with him *D. M. Miller* and *James A. Logan*, for appellant.—Defendant had the superior right to the use of the river. Plaintiffs were at the best obstructors of navigation: Deddrick v. Wood, 15 Pa. 9. Any obstruction of a navigable river is a public nuisance : Sherman & Redfield on Negligence, 528; Dugan v. Bridge Co., 27 Pa. 303; Monongahela Bridge Co. v. Kirk, 46 Pa. 112.

The measure of duty of the defendant was to guard with reasonable care against any accident happening from the boat to those lawfully using the river, which could or ought to have been foreseen. He was not bound to guard against any extraordinary event which could not have been foreseen: Phila. & R. R. R. v. Hummell, 44 Pa. 379; McGrew v. Stone, 53 Pa. 436; Murphy v. Brooklyn, 97 N. Y. 642; Penna. R. R. v. Balt. & N. Y. Ry., 37 Fed. R. 129.

*Edwin W. Smith*, *Knox & Reed* with him, for appellees.—Plaintiff was not guilty of contributory negligence: Jutte v. Keystone Bridge Co., 146 Pa. 400; Gumbert v. Wood, 146 Pa. 370.

Defendant owed plaintiffs the duty of tying his boat up with ordinary care: Neel v. Blythe, 42 Fed. R. 457 ; Sherman & Redfield on Negligence, § 22.

The questions were properly left to the jury.

OPINION BY MR. JUSTICE GREEN, January 3, 1893 :

The plaintiffs in this case were bridge builders who had erected a false works in the Allegheny river at Pittsburgh, in

the building of a bridge across the river at that place. The defendant was engaged in the lumber business on the river, and had a lumber yard at Tarentum, a place on the river about twenty miles above Pittsburgh. On the night of May 20, 1890, two boats loaded with lumber and belonging to the defendant were tied up a short distance above his yard at Tarentum, and one of them, the outside one, became detached from the other, in some way not explained by the testimony, and floated down the river. When it reached the bridge which the plaintiffs were building at Pittsburgh it ran against their false works erected in the river and carried away a portion of them, and this action is brought to recover damages for the loss thus occasioned.

As a matter of course there can be no recovery in such a case, unless the defendant was guilty of a breach of some legal duty which he owed to the plaintiffs. The foundation of the action is negligence, and the accusation of negligence is only made out by showing a breach of a legal duty owing by the defendant to the plaintiffs. In considering this question it must be borne in mind that the defendant, in occupying a portion of the river's surface with his lumber boats, was in the exercise of a perfect legal right. He was engaged in a lawful calling and had an absolute right to float his lumber on the river and to tie it up along the shore. His right in these respects was in every sense fully equal to any right of the plaintiffs to erect their false works in the river. In one sense the defendant's right was superior, as he was simply occupying the river for its regular and legitimate uses, and the plaintiffs were using it for an exceptional purpose, lawful it is true, but temporary in its nature and only continuing as long as the necessities of the occasion required the maintenance of the false works. It was an obstruction in the river which could only be justified by the bridge construction. It must also be remembered that these false works were twenty miles distant from the place where the defendant's lumber was moored, and there is no evidence in the case to show that the defendant had any knowledge of their existence, or that he had ever received any notice of their erection. He was therefore subject to no duty to take any special or unusual precautions against injury to the plaintiffs' false works by the floating away of

his boat.  He was subject only to the duty of taking the ordinary precautions against such injuries to others as might arise from the ordinary uses of the river and which could or ought to have been foreseen.  In order to convict one of negligence the consequences of his act or omission must be the natural and probable results of his fault which, for that reason, might be foreseen by ordinary forecast.  But persons are not bound to take precautions against occurrences of an extraordinary or unusual character, and therefore are not likely to be foreseen.

We have many times announced these principles and applied them in various circumstances and in various relations among men.  Thus in McGrew v. Stone, 53 Pa. 436, we said: " The general rule is that a man is answerable for the consequences of a fault which are natural and probable, and might therefore be foreseen by ordinary forecast, while it is true that if his fault happen to concur with something extraordinary, and therefore not likely to be foreseen, he will not be answerable for the unexpected result. . . . We are not to link together, as cause and effect, events having no probable connection in the mind, and which could not, by prudent circumspection and ordinary thoughtfulness, be foreseen as likely to happen in consequence of the act in which we are engaged.  It may be true that the injury would not have occurred without concurrence of our act with the event which immediately caused the injury, but we are not justly called to suffer for it unless the other event was the effect of our act, or were within the probable range of ordinary circumspection when engaged in the act."

We have applied the same principles in actions to recover damages for injuries occurring on public roads.  Thus in Schaeffer v. Jackson Township, 150 Pa. 145, our Brother HEYDRICK, delivering the opinion of this court, said : " It is a general rule, as well settled as anything in the law of negligence, that a man is responsible for such consequences of his fault as are natural and probable, and might therefore be foreseen by ordinary forecast, but if his fault happen to concur with something extraordinary, and therefore not likely to be foreseen, he will not be liable for the extraordinary result."  To the same effect are Worrilow v. Chichester Township, 1 Adv. Rep. 622, and Kiefer v. Hummelstown, 151 Pa. 304, and

Jackson Township v. Wagner, 127 Pa. 184. In the last case we said : "Township officers are bound to anticipate and provide against the ordinary needs of travel conducted in the ordinary manner, and to remove obstructions and defects which would naturally or probably cause injury to the traveler along the highways; but the township is not an insurer against all possible accidents, nor is it bound to anticipate the danger to which a broken wagon or a frightened horse may expose the driver. Such a burden would be too heavy for any township to bear, and the law does not impose it. The general rule is well stated in Hey v. Philadelphia, 81 Pa. 44, to be, that "roads and bridges are made for ordinary travel; if they fulfill such purpose they are sufficient, and those in charge of them are not responsible for extraordinary accidents occurring on them."

In the further consideration of the question of the defendant's culpable negligence, the special occasion of the escape of the defendant's boat must be regarded.

The testimony in the case on both sides showed that there was only an ordinary stage of water in the river during the day preceding the night on which the boat floated off. An ordinary stage of water was about five to six feet in depth. During the day and evening the river had risen slightly and slowly about two feet. The great bulk of the testimony was that it was not raining in the vicinity of Tarentum during the day, and the weather was fair as evening approached. All the witnesses who testified in regard to the rise during the night said that the river began to rise rapidly between nine and ten o'clock, and from that time till about five o'clock the next morning it had risen from eight to twelve feet, and there was a very considerable run of driftwood. Whether this was an extraordinary and unusual rise in so short a time was a subject of considerable testimony, and it was, practically, unanimously stated by the witnesses on both sides that it was of that character. Thus H. F. McCassley, a witness for the plaintiffs, said : " Q. Was the river very high that night ? A. Well in the evening it was about a six foot stage as near as I can tell. Q. What stage had you in the morning ? A. Well as near as I can tell about a sixteen foot stage. Q. Raised about ten feet ? A. About ten feet that night. There had been heavy

rains through the day and that night. Q. Is that a sudden rise? A. Yes, sir; it came pretty sudden. Been heavy rains up the river."

James Arner, another witness for the plaintiffs, said: "Q. The next morning when you say you saw the lines slipping, was the river pretty high? A. Yes, sir; awful high. Q. It got very high that night? A. Yes, sir. Q. How much did it rise that night? A. They calculated it had raised ten feet."

This was not contradicted by any witness for the plaintiffs.

J. R. Copeland, a witness for the plaintiffs, said: "Q. Do you remember the condition of the river at the time of this accident? A. I remember that it rose a great deal during the night, the same night the boat got away. Q. What was the condition of the river, if you remember, the evening before? A. It had been raining a little all day before until that evening is my recollection. Q. Do you remember how high the river was the evening before? A. No, sir. Q. Was it the ordinary stage or high stage or low stage? A. It wasn't anything extraordinary the evening before, just rising water some. Q. Anything unusual about it? A. Oh no, sir. Q. What was the condition of the water next morning? A. The next morning it had risen a great deal higher, how much I wouldn't be able to say, probably eight or ten feet. Q. What kind of a rise do you consider it the next morning? A. Very sudden, very quick rise. . . . Q. This flood the next morning, did you consider it an unusual flood? A. Well not so much unusual for the height of flood, as it was an unusual amount of raise for one night, very rapid rise for one night."

John Diester, a witness for defendant, having testified that he was running his ferry at this place until about half-past nine that night and that up to that time the whole rise was only about two feet, and that the next morning when he saw the river it was up level with the bank, was asked: "Q. How much of a rise would that be? A. I judge from the time I went to bed until I got up in the morning, I judge about eight feet from the time I went to bed. Q. In your opinion what kind of a rise is that? A. In my opinion it is a very quick rise for the time, from the night before to the next morning. I have never seen it rise any faster to my knowledge, that is in nine hours. I have seen it rise a foot an hour often enough, but

that wouldn't keep up sometimes when you would look for it, but I have not seen it rise that fast when you were not thinking of any high river. Q. What was the condition of the weather the day before? A. The weather the day before was nice to my knowledge; it was clear if I am not mistaken, that is, that evening the sun set clear; it was very light up until very late that night. Q. Was there anything to indicate to you an eight foot rise in the river? A. No, sir, there was not."

William Johnson, a witness for defendant, said: " Q. Had you noticed the condition of the river the evening before? A. Yes, sir; the evening before the river had been rising a little that day as near as I can mind. Q. By the condition of the river was there anything to indicate a sudden rise in the river? A. No, it didn't look as if there was going to be such a big rise as there was that night to me. Q. Did you notice the condition of the river next morning? A. Yes, sir; I saw the river next morning. Q. What was it? A. A pretty high stage of water. Q. What kind of a rise would you consider that for one night? A. As near as I can tell about ten feet of a rise. Q. Was that large or small? A. That is a pretty good rise I think for that length of time. Q. Was it a usual or more than a usual rise? A. It is what I would call an extraordinary rise."

William Harris, another witness for defendant, having said the river was about five or six feet the evening before and that that was about the ordinary stage of the water, was asked: " Q. Did you notice the river the next morning? A. Yes, sir, I did. Q. What was it then? A. It was extraordinarily high next morning. Q. When had the rise taken place? A. It must have commenced raising as late as nine or ten o'clock so rapidly, because I had gone to bed and knew nothing of the river starting to rise so rapidly until in the morning. Q. How near the river do you live? A. My house is right directly on the river bank. From my back windows you can look down into the river. Q. How much do you think the river rose that night? A. I would judge probably about twelve feet. I judge that from the height of the bank at my place. . . . Q. In your opinion as a river man, was there anything, taking the condition of the weather into consideration and the stage of the river,

anything to indicate a sudden rise? A. Well no, sir, I don't think there was any indications, no local indications around there of a sudden rise."

Other witnesses for the defence testified that the rise during the night was a rapid and extraordinary rise. In regard to this subject the testimony of the plaintiffs' witnesses was substantially to the same effect, and there was none that contradicted the testimony of the defendant. It must therefore be taken as an undisputed fact that the rise in the river after nine o'clock on the night in question was sudden, rapid, unusual and extraordinary in its character, and that there was no indication of its approach in the opinion of experienced river men. That there was no legal duty to take unusual precautions against the occurrence of such a rise during the night, which has already been determined by the fact that there was no proof of any notice or knowledge of the existence of the plaintiffs' false works twenty miles distant, is further determined by the condition of the river and the weather during the day and evening preceding.

It only remains to consider whether there is any proof of actual negligence in the precautions that were taken to make the boats ordinarily secure.

Arthur Brenaman, a witness for the plaintiffs, testified that he brought the boats down at the instance of the sellers of the lumber, and that he was told by an agent of the defendant to take them to the place where he landed them. He was asked: "Q. When you landed them did you tie the boat? A. Yes, sir. Q. Were they still lashed together when you left them? A. Yes, sir. Q. To what did you tie them? A. I tied them to a raft that was lying on the bank. Q. Was that raft lying up high and dry? A. Yes, sir. Q. Was that raft tied to anything? A. I couldn't say whether it was or not. Q. How many ropes did you have on those two boats? A. I had two. Q. What length were they, do you know? A. I can't tell you what length they were. Q. Were they the ordinary length of ropes used in that kind of business? A. Yes, sir, they were. Q. Do you know how thick they were? A. No, sir, I do not. Q. Were they old rope or new rope? A. New ropes. Q. Were they good and strong? A. I judge they were, they were new. I could not say how strong they were. . . . Q. Was one of

these ropes strong enough to tie those two boats or either of them during an ordinary rise ? A. It was during any ordinary rise, yes sir. . . . Q. How were those boats lashed together? A. They were tied with a rope line. Q. One line? A. Well now I don't remember whether I had used two lines or not in tying them together, but I know I had them tied together with a rope. Q. Who tied them? A. I helped to tie them. . . . Q. The way you left them when you tied them did you consider that you had tied them in such a way up to the raft that was on high ground that it would make the boats safe during an ordinary flood or ordinary rise ? A. I considered those boats were all right in an ordinary stage, what I would call an ordinary stage in the river."

After describing minutely how he tied the line around the raft and around one of the crosspieces of the boat, he was asked: " Q. You think you had tied it safe ? A. Yes, sir, I had it tied all right, the two boats tied together. Q. They were tied together with a line at both ends ? A. Well now I couldn't just say that they were tied together at both ends, but I had them lashed together in two places when I brought them. Q. What places were these ? A. You mean at the end or in the middle ? Q. Yes, sir. A. I had it tied to one end and I can't remember just where I had the other tied. Q. But you had them tied in two places ? A. Yes, sir. Q. How did you make those ties ? A. Well I think I had them tied under the ties the way I had the other. Q. By tie you mean crosspieces on the bottom of the boat? A. Yes, sir. . . . Q. You passed your rope under these crosspieces at the bottom of the boat? A. Yes, sir. Q. You know how to tie a rope ? A. I do. . . . Q. If you didn't change them did you still think they were secure when you left them lashed together? A. I think they were all right. I think they were tied all right."

As this testimony was given by the plaintiffs it would have to be regarded as destructive of the plaintiffs' allegation of negligence, if it were all there was in the case. As it is, it is of very great weight in support of the defence that all due precautions were taken.

F. M. Campbell, another witness for plaintiffs, testified that he was a river man in charge of a steam towboat and that he helped Mr. Diester change one line on the boats, that they

changed the line that was tied, from the inside of the inside boat to the outside of the inside boat, that Diester was tying the boats up, securing them, when he was there, and that the boats were dropped a few feet down the stream, and pulled in the upper end of the boats so as to let the other end swing out a little, and was asked: " Q. In swinging those upper ends into shore did that make the boats any safer? A. Certainly it did.  Q. That made them safer than they were before? A. Yes, sir.  Q. And you helped Diester to do that?  A. Yes, sir.  Q. Was that the proper way to handle them? A. Yes, sir. Q. Was there a good tie made?  A. I didn't notice the tie. Q. Did you notice the rope?  A. It was a good rope.  I noticed that in handling it.  Q. How were they fastened to the shore?  A. I think it was tied to a raft that laid out on the shore when I was there.  Q. And was that raft still high and dry when you were there?  A. Yes, sir, out on high ground."

This testimony also, being put in by the plaintiffs, instead of tending to show negligence, tends strongly to show good care and precaution on the part of the defendant.

On behalf of the defendant John Diester was examined. He was the ferryman at Tarentum and was always engaged by the defendant to take care of boats coming down the river for them.  Mr. Copeland asked him to take charge of these boats and see that nothing would happen and he did so.  He first went over in the afternoon, perhaps two or three o'clock. He said: " When I went up and seen how the boats looked and I thought everything was all right for the stage of water at that time. . . .  But I noticed the river started to rise a little in the afternoon, oh, about eight or nine inches, to supper time from about two or three in the afternoon. . . . . I ate my supper and after supper I went over again, thinking I had better go over to see the boats again and secure them better because the river was rising a little.  I went up to the boats and noticed how they were tied.  There were two lines on the boat."  He then described minutely how he tied the raft and the boats, tied one end of the rope, which was about twelve feet long, to a willow tree on the bank, then took the other end of the line from the inside boat to the outside boat, fastened it around one of the crosspieces of the outside boat

and said: " I remember bringing the line back from the out-side boat over the snubbing post and putting three half hitches over the snubbing post on the outside boat, and then we brought the end of the line back over to the inside boat over the snub-bing post on the inside boat and put three half hitches on it. This made the line double on the two boats. The same line that was double on the two boats was single out on shore. Q. This was for the purpose of tying the outside boat to the inside boat? A. More secure than what it had been. Q. What did you fasten it to on the outside boat? A. The line came around the crosspiece, a piece like this put into the gun-nel. Q. Crosspiece of the boat? A. Yes, sir. Q. Ran it under? A. Yes, sir, that is the safest way you can tie it. Q. Do you know whether they were lashed together at any part? A. Yes, sir; I had it lashed together previous to that right below the snubbing post. Q. How many ropes were there in all? A. There were two ropes on the raft that I know that I could see, and there was one line that I had; that line belonged to me. Q. You took that up along? A. Yes, sir; an inch and a quarter line. Q. These lines that were on there, what kind were they? A. New lines. . . . Q. You considered the two lines in good condition? A. Yes, sir; they were in good condition. Q. Then the boats were snub-bed together or tied together at two different points? A. Yes, sir."

After saying he was raised along the Mississippi river and had experience in tying boats on the Allegheny river, he was asked if he thought the boats securely tied, and replied, " I thought it was perfectly safe." He was also asked, " How many ropes were there in all? A. There would be just as much as four lines holding the two boats together; that is there was two lines, but each line was carried over and back again." After stating that when he discovered next morning that the outside boat was gone, and that the line that lashed the two boats together was gone, he was asked: " Q. Then there were three ropes in all? A. Three ropes in all. Q. Which is the one that you never saw again? A. The one that the two boats was lashed together with, while I made the other tie. The boats was lashed together with that before I came there to bring that new line over to the outside boat and make three

half hitches over the two snubbing posts. This other line, the tie that I made there that I explained a little while ago, it was made after, it was made after the lashing was made, the boats was lashed together at the time I brought the end of the new line over to the outside boat. Q. Was that securely tied? A. I should think so. I thought at the time if anything would give, everything would have to go before that would give. That is my opinion, I thought everything would have to tear loose before one boat could go. Q. How long were you on the river that evening? How long did you run your ferry? A. I judge about nine o'clock, half-past nine. Q. Up to that time what was the condition of the river? A. Indeed I don't know. I judge it had risen about two feet."

It is to be said of this testimony that it was not contradicted by any evidence in the case. It was corroborated by the plaintiffs' witness, Campbell, who assisted in tying the boats and raft. As the raft and inside boat remained and held their positions, no question of negligence arises as to them and their mode of fastening. No question can arise except as to whether the defendant performed his legal duty to the plaintiffs by the precautions he took to secure the outside boat. Upon the testimony thus far considered, both that of the plaintiffs and the defendant, there is not a scintilla of proof of any negligence whatever. On the contrary there is abundant, absolute, uncontradicted evidence, not only that the duty of ordinary care was strictly performed, but that extraordinary care, unusual precautions were taken, such only as would be required to guard against an anticipated flood of high water. No witness testified that the methods of lashing and fastening, as described in the testimony of Diester, were in the least degree careless or insufficient, or that there were any other methods that were usually observed, or that would have produced greater security. In point of fact there was but one witness for the plaintiffs who gave any testimony on this subject or who expressed any kind of opinion in relation to it. It was the witness H. F. McCassley. He was river foreman for a glass company and had charge of some boats of the company on the night of the escape of the defendant's boat. On his examination in chief he gave no testimony whatever as to the tying up of the boats. He only described his own connection with his own boats, stated the

position of the defendant's boats, the condition of the water and a few other matters descriptive of the situation.   He said: "I was there from nine o'clock off and on until morning. Along about half-past two I went up home and was off about an hour and I came back again something after four.   Q. And was the boat gone when you came back?   A. Yes, sir; the boat was gone when I came back."   He was asked: "Q. Did you see anybody there with these Logan boats that night? A. No, sir.   Q. Did you see anybody in the early part of the evening there?   A. Yes, sir.   Q. Who was there?   A. Mr. Diester was there in the early part of the evening and tied them up.   Q. What time was he there?   A. Well now I couldn't just say, along in the afternoon towards evening, about four o'clock or three, somewhere along there.   I couldn't just say, I didn't pay attention."

He thus proves that he didn't even see Diester at either his second visit to the boats, after supper, or his third one between eight and nine o'clock at night.   Consequently he has no knowledge of what Diester and Campbell did.   He was asked on cross-examination: "Q. Had you noticed how the two boats or either of them had been tied before the night of the high flood ?   A. I didn't pay much attention to how they were tied.   I wasn't interested in them one way or the other until that night.   Q. The night of the high flood did you notice how they were tied ?   A. I knew there was a line run ashore off the inside boat and a line on the outside boat; what you call a lashing, a short piece of rope.   I couldn't tell you how long it was, it was tied under one of the cross timbers, what a good many people call a floor timber, on one boat and run through under the floor timber on the other boat, and it might have been run through two, and then back on the other boat and tied again, and I could not say whether one or two. . . . I took notice to its being tied in that shape."   As this was the condition in which Brenaman, the plaintiffs' witness, had left the boats, that is, lashed together and tied to the raft and the raft on the shore, it is at once apparent that the witness was only describing the situation of the boats before Diester had done his work.   This is confirmed by the further testimony of this witness.   He was asked: "Q. When you speak about the cross-tie, that is a tie below the top of the boat?   A. It is a

place I wouldn't just say what size, may be six by ten or six by eight. Q. Is it very strong, and a good place to tie to? A. Supposed to be; mortised in the gunnel on one side. Q. Is it strong and a good place to tie to? A. Yes, sir; that part is strong enough. Q. After the rope was around this cross-tie was there also a hitching around the snubbing post? A. I don't remember any line being on the snubbing post; I think the snubbing post is handier to the other end than where the line was. Q. Did you notice whether there were any hitches around the snubbing post? A. I didn't notice any on it. Q. The tie you did notice, was it tied properly? A. It was tied good enough but I think it was down too far on the flat bottom, would have been to suit me. Q. It was tied good enough? A. It was tied good enough if it had been on the other end. . . . Q. Did you notice whether it was lashed any place else to the snubbing post beside that? A. I didn't see any other. Q. Can you say it was not? A. I wouldn't say it was. . . . Q. To what was the other end of the rope tied on shore? A. Well now I couldn't say for I didn't look. Q. Then did you look whether the boats were carelessly or carefully tied? A. I didn't look at the boats at all any more than the outside boat the way she was tied; I was afraid of her breaking loose and tearing us loose. Q. You don't know about the other end? A. I didn't go to look to see the other end. . . . Q. Were the others not tied securely? A. I wouldn't like to risk them. Q. How do you know? A. Didn't have enough lines out. Q. You don't know whether the end was tied to the shore? A. I know there was only one line out; it must have been tied some place. Q. You didn't look where it was tied? A. No. Q. If you didn't look where it was tied, how do you know whether it was rightly tied? A. I didn't say it was rightly tied. I said there was one line out and tied; I didn't say whether rightly tied or wrong. Q. Did that line break that night? A. No, sir; that line stayed there and that boat stayed there that that line was tied to. Q. Then there was nothing the matter with that line that night? A. I have nothing to say about that line. Q. Why not? A. Because it was the outside boat that went off. . . . Q. Just tell us what there was about those two lumber boats that you considered unsafe? A. I was afraid of them break-

ing loose and coming into us. Q. Was it the rope that went to shore? A. No, sir; I was afraid of the rope on the outside breaking. Q. And the very one you were afraid of broke. Why were you afraid that would break? A. I didn't think it was tied secure; didn't think he had enough lines. Q. Did you see Mr. Diester that evening? A. Yes, sir. Q. Did you tell him? A. No, sir. Q. Why didn't you? A. It was none of my business. Q. You just stood there and let it go and run the risk of letting it come down against your craft? A. When I saw Mr. Diester it was before I came in there with our boats. . . . Q. This rope you speak of from the inside of the outside boat, where was that on the boat? A. Well tied back about a third way from the upper end as near as I can tell. Q. Then there was no rope at the upper end at all? A. I didn't see any rope at the upper end."

The foregoing is literally all of the testimony of this witness relating to this subject. When his testimony is narrowed down to a definite statement as to what he considered unsafe in the way the boats were secured, it is found that he supposed there was but one line between the inside and the outside boat. The line, and it was only one, that held the inside boat and the raft to the shore, he admits was sufficient. He thinks there should have been more than one line between the outside and inside boats. He only saw the one line and therefore concluded there was but the one and his opinion is based upon that circumstance alone. He knew nothing about the work done by Diester and Campbell in tying the other lines and fastening them about the snubbing posts, so that there were practically four lines between the two boats. What his opinion would have been if he had known of all the lashings between the boats, of course cannot be known. When he saw the boats there was no lashing near the upper end, and such a lashing was all he suggested as necessary for security. Yet that very lashing was there after Diester finished his work.

No other testimony was given by the plaintiffs than that of this witness to sustain the charge of negligence, and none other is referred to in the argument for the plaintiffs. We are clearly of opinion that this testimony is entirely insufficient to sustain the charge. The duty of the defendant was, at the best, to take ordinary precautions against the escape of his

boats in an ordinary stage of water, or a very slight rise, as that was all that was indicated during the afternoon and evening. That duty was sufficiently discharged by only one lashing of the two boats. But there was the equivalent of four such lashings by the uncontradicted testimony in the case, and it is needless to argue the sufficiency of such precautions. There is not a scrap of testimony in the case to show that they were not sufficient in all ordinary and reasonable expectation for any stage of water. But the defendant was not bound to take extraordinary precautions, and the escape of the boat was due entirely to an unusual and extraordinary condition of the water. As we have seen, legal duty, in such case as this, does not require precautions against unusual and extraordinary events. In this case it was the extremely rapid, sudden and extraordinary rise of the river that caused the plaintiffs' injury. The boat held its place until the flood was at, or near, its highest and most violent stage, and against that condition of things the defendant was not legally bound to take precautions. We see nothing, therefore, in the testimony, which convicts him of a negligent disregard of any duty owing by him to the plaintiffs. In that view of the case it was the duty of the learned court below to affirm the defendant's first point and take the case from the jury.

Judgment reversed.