## SHARPSBURG SAND CO. v. MONONGAHELA RIVER CONSOL. COAL & COKE CO.

(District Court, W. D. Pennsylvania. May 1, 1906.)

No. 7.

1. COLLISION—BOATS BREAKING FROM WHARF IN FLOOD—SUFFICIENCY OF MOORING.

Respondent had a fleet of 93 empty coal barges tied up at a landing on the Ohio river a short distance below Pittsburg, the most of which broke loose when the river was in flood and struck and destroyed or damaged certain sand boats of libelant which were moored at a landing below. Respondent's fleet was divided into three sections, the upper, which first broke away, having 17 boats, 7 of which were abreast in each of the first two tiers. At the head of the landing was a breakwater which extended into the stream a sufficient distance to protect 4 of the inner boats from the current. They were made up and tied in a customary manner, and secured by more than the usual number of lines. The river was high when they were placed there, and during the succeeding two days rose thirteen feet, and at the time of the accident, boats were engaged in removing the outer barges. *Held,* that it was not chargeable with negligence; it appearing that the fleet was not only moored and tied in the usual manner, but was being constantly looked after by experienced men who · had not previously deemed it necessary to change the position of any of the boats, and, further, that the breaking way was in fact caused by certain overturned barges which came down from above, and were carried by the current under those of the fleet.

2. SAME—NEGLIGENCE—REASONABLE AND ORDINARY CARE.

The measure of the respondent's duty was reasonable care, the standard of which is that of the man of average foresight and prudence, which in the situation here is to be determined by that which was usual and ordinary.

In Admiralty.

Samuel B. Griffiths, for libelants.
Harry A. Jones and Charles C. McIlvaine, for respondents.

ARCHBALD, District Judge.* The libelants seek to recover compensation for the loss of two sand flats or flat bottomed boats, together with the sand with which they were loaded, which were destroyed; and the expense of recovering two others, which were carried away, on the night of December 15, 1901; by reason of the alleged negligence of the respondents. These four sand flats were tied up at Petty's Landing on the Ohio river near McKee's Rocks, a little below the city of Pittsburg, where they were being unloaded; the sand having been sold to William Petty, the owner of the landing, by whom it was being removed and put on board cars. They were run into and torn from their moorings by certain empty coal boats or barges, belonging to the respondents, which had been fastened up at the Walton or Snyder Landing, about a mile above, but had broken their tie lines and got away. The respondents had some 93 empty coal boats and barges in that vicinity awaiting distribution, divided up into three independent fleets or sections, each separately tied. The upper one of these was composed

*Specially assigned.

of 17 boats, the first two tiers of which were 7 boats wide, and it was fastened at the head of the landing, immediately below the breakwater abutments by which the landing was protected. The breakwater was only wide enough to cover 4 of these abreast—or at the stage of the water when the break occurred, possibly 5—so that as originally arranged 3 of them were outside in the current. But 1 of these from the front tier had been removed, and put in down below, so that there were only 2 at most in that position in the end. The river was in flood, having risen from a 12-foot stage on Friday when the boats were brought there (8 feet being the ordinary height) to a 23-foot stage Sunday evening when they broke away. The head fleet went first, and bearing down against the other two, they all went off together, carrying with them also a few flats belonging to the Iron City Sand Company, which were tied up below them. Out of the whole number there, only seven pieces on the inside of the second fleet were left. It was this conglomeration of runaway boats and barges, or some part of it, which was precipitated upon the libelants' flats at the landing where they were fastened, riding over and sinking two of them, and sweeping away the others in the flood. There is some controversy as to whether these flats were fastened with both head and stern lines, or with head lines only, allowing them to swing out broadside into the stream from the effect of the eddy, thus getting in the way of the oncoming barges which they would have otherwise escaped. But I have no doubt, as testified by Mr. Petty, that they were properly and securely tied, and that whatever their position when finally struck and destroyed, it was not due to any want of care in this respect, but to their having collided with the advance section of the respondents' escaping barges, by which they were left exposed to those which followed.

The real question in the case is whether the respondents were negligent, and that depends of course upon whether proper care was exercised. It is claimed that the head fleet was too wide, the abutments of the landing where it was moored being sufficient to cover and protect but four boats abreast, leaving the outside three to bear the brunt of the current and the drift which came down with it; and that if they had been strung out as they should have been, so that all were inside—either originally when they were first brought there, the river even then being on the rise, or subsequently, on the day of the disaster, when the danger was obvious—the accident would not have happened. It is contended on the other hand, that the fleet was not of an unusual or unsafe width, and that it was not required to be wholly within the protection of the abutments in order to be so; furthermore, that at the time of the break an effort was being made to reduce the width by taking off the outside barges, one of which had been already removed and another was about to be so. It is pointed out that the fleet was securely tied, and it is conceded that there were lines enough out, extra ones having been added from time to time until there were 11 head lines in all; including a three-quarter inch wire, and two or three breast lines. Accounting for the accident, it is claimed by the respondents, that it was brought about by certain upturned coal bottoms,

which came down the Monongahela and got under the fleet, making it impossible to hold it, with the result which followed. These are the questions at issue between the parties which are now to be disposed of.

The measure of the respondents' duty was reasonable care, and if this was exercised, they are not liable. Neel v. Blythe (D. C.) 42 Fed. 457. McCauley v. Logan, 152 Pa. 202, 25 Atl. 499. The standard is that of the man of average foresight and prudence; Titus v. Railroad, 136 Pa. 618, 20 Atl. 517, 20 Am. St. Rep. 944. And in such a situation as here, is to be determined by that which is usual and ordinary. If, therefore, the usual course was taken with regard to the assembling and mooring of this fleet at the outstart, and everything within reasonable bounds was done in the care and oversight of it afterwards, it cannot be said that the respondents were culpably negligent. As already stated, the negligence charged consists in tying up the fleet seven abreast, so that nearly one-half of it was out in the current; and in failing to remove the barges which were outside the abutments, when the danger from leaving them there became manifest. But if there is one thing clear in the case it is, that this disposition of the fleet was entirely within the usual and ordinary. Originally this landing had no breakwater, that being a later construction put in by the railroad, when it came along there, to compensate for crowding the landing out into the stream. For a number of years, therefore, boats and barges were tied up at it, as they are at many others, without any such protection, exposed to the force of the current in times of high water equal to this, and that, without question. The size of this fleet was not an extraordinary or improvident one, 24 being the recognized complement of this part of the landing, and the whole combined landing—Walton's, Brown's, and Snyder's—being capable of taking care of considerably over 100. Seven pieces at the head also was not unusual, fleets wider than that, and loaded where these were empty, having been safely held there, both before and since. The fleet, as an additional circumstance, was admittedly well tied, it being conceded, as already stated, that the lines upon it were sufficient to hold it if anything could. These facts are proven by the libelants' own witnesses, as well as those of the respondents, and are not therefore in dispute. No doubt, as a matter of argument, a fleet which is in behind a breakwater where nothing can get at it is in a safer position than one which projects beyond it and has some of its pieces exposed. But the question is not one of absolute, but of comparative safety, and it is not to be expected, nor is it indeed practicable, that in the ordinary affairs of life every possible risk shall be covered. All that can be asked, as already pointed out, is that those precautions shall be observed, which are usually taken by persons who are engaged in and have experience of the needs of the particular business in question; and so far as the assembling and tying up of this fleet are concerned, this degree of care seems to have been exercised.

The question remains with regard to the removal of the outside boats, as the flood increased. The necessity for this was eventually recognized and steps taken to meet it, but apparently not soon enough. The complaint is that the danger was obvious, and that action should

have been taken earlier. But even though we should reach this conclusion now, looking back upon the event, it does not necessarily follow that it was negligence not to realize it at the time. Was it prompted by ordinary prudence and foresight as the case then and there presented itself? That is the question. And I am not prepared to say under all the evidence that it was. The representatives of the respondents were on the ground in force, alive to the situation and endeavoring to look after it closely. Although it was Sunday, William Johnson who had charge of the landing, a man of long experience, was there all day with four or five assistants, and Mr. McKinley, a member of the transportation department, went there the middle of the afternoon. About the same time two of the company's steamboats were also sent there. How then can it be said, with any confidence, that a step which did not suggest itself to men of such experience was so manifestly called for by the conditions, which were under their eyes, but which we can only get at second hand, by hearsay, that they were lacking in ordinary care in not recognizing it and acting accordingly? It is no doubt true, as said by Mr. Johnson, that if they had begun in the morning, they could have strung out the fleet so that it would have been entirely within the breakwater; but they did not think it was necessary at the time, and when they did it was too late to do so successfully. This is the sum and substance of the whole matter, and it justifies the conclusion, that if they did not realize the necessity for earlier action, there was no apparent occasion for it, and nothing therefore upon which to convict them of negligence in not doing so.

This is conclusive of the case, but there is another feature of it, equally so, which is still to be adverted to. It is clear from the evidence that this fleet never would have broken away from its moorings, as it did, except as it was run into by the upturned coal bottoms which came down the river about that time. We may not be able to identify these with those which got away from Jutte & Co. at the mouth of the Youghiogheny; but they are no myth, as argued. Neither is it necessary to consider whether it was possible for them to have come over the top of the breakwater. Mr. Johnson, to whom reference has already been made, says that there were upturned barges and boats of all kinds that came down the river just before the fleet broke loose, one of them hitting the steamboat "T. J. Woods" on which he was, which was out in the river trying to take off some of the outside barges. It is to this cause that he ascribes the accident, declaring that the fleet was lying perfectly safe until then, and that if this drift had not got under it, as it did, they could have held it. So Capt. Lenhart, who was on the same boat, testifies that he also saw the overturned flat which hit them, and heard the grinding and crashing of the drift under the barges; as did also Mr. McKinley, who says, that the fleet buckled and broke away just as the upturned flat and the other drift went by. This evidence comes from both sides of the case, and accounts for the accident as nothing else does. Partially sheltered and tied as the fleet was, with the extraordinary number of lines holding it the force of the current alone was not sufficient to tear it away, and it must have resulted therefore from some superior and irresistible

force, such as these upturned runaway bottoms; which the respondents were not required to anticipate or guard against, if indeed they could.

From whatever point of view, therefore, we look at the case, there is no liability on the part of the respondents, and the libel must be dismissed, with costs.