# New York & Penna. Co. *v.* New York Central R. R. Co. et al., Appellants.

*Equity—Remedy at law—Decision in limine—Waiver—Equity, Practice—Act of June 7, 1907, P. L. 440.*

1. An allegation, in an answer in equity, that plaintiff has an adequate remedy at law, will be deemed waived, if it is not required to be decided in limine, as provided by the Act of June 7, 1907, P. L. 440.

*Equity—Findings of fact—Evidence—Appeals.*

2. If there is sufficient evidence to sustain a finding of fact by the court below, the Supreme Court will accept it as it has been found.

*Carriers—Railroads—Rates—Excessive charges—Weights — Initial carrier.*

3. Where the tariff of a railroad company provides that freight shall be charged according to railroad weights, the difficulty of obtaining them will not justify an excessive charge based on some other method of weighing.

4. When freight is to be paid according to railroad weights, the duty of weighing it rests on the initial carrier, who accepts it for transportation over its own and other roads.

*Negligence—Results from wrongdoing — Natural and probable consequences—Doubts to be resolved against wrongdoer.*

5. One who wrongs another is responsible to the latter for the natural and probable consequences of the wrongful act.

6. He is not liable, however, for results which do not ordinarily and in the natural course of events flow from his wrongdoing.

7. When it is impossible to determine the exact amount of loss to one who has been wronged, doubts in regard thereto must be resolved against the wrongdoer.

8. A defendant cannot be held liable for failing to do that which he is under no obligation to do.

Argued March 17, 1924. Appeals, Nos. 333 and 334, Jan. T., 1924, by defendants, from decrees of C. P. Clinton Co., April T., 1921, Nos. 2 and 3, for plaintiff, on bills in equity, in case of N. Y. & Penna. Co. v. N. Y. Central R. R. Co., and Same v. Director General of Rail-

roads. Before FRAZER, WALLING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ. Decrees modified.

Bills for accounting for alleged excess freight. Before BAIRD, P. J.

The opinion of the Supreme Court states the facts.

Decree for plaintiff in No. 333 for $30,920.78, and in No. 334 for $37,439.64. Defendants appealed.

*Errors assigned* were, inter alia, decrees, quoting records.

*Henry Hipple,* with him *Seth T. McCormick, Jr.,* for appellants.—Notice to the coal companies, consignors, constitutes notice to appellee (consignee) that coal would be carried on mine weights: Brown v. R. R., 36 Ill. App. 140; McMillian v. Ry., 16 Mich. 79; Cal. Powder Works v. Ry., 113 Cal. 329; Western Transit Co. v. Hosking, 19 Ill. App. 607; Jennings v. Ry., 127 N. Y. 438; Penna. R. R. v. Descalzi, 59 Pa. Superior Ct. 614.

*Thomas Raeburn White,* with him *B. F. Geary,* for appellee.

OPINION BY MR. JUSTICE SIMPSON, April 14, 1924:

These two appeals are from money decrees in favor of plaintiff, one against the New York Central Railroad Company, for wrongs alleged to have been committed by it, and the other against James C. Davis, agent, for wrongs alleged to have been committed by the railroad administration, while the New York Central Railroad Company and the Pennsylvania Railroad Company were both being operated by the government, under the management of his predecessor, as government agent. The cases were tried together in the court below, were argued together here, with a single exception raise the same questions, and will be decided in this one opinion. In passing, it may be said that the only allegation as to

a lack of jurisdiction, is that there was an adequate remedy at law; this does not require consideration, however, since it was waived by not having the objection decided in limine, as required by the Act of June 7, 1907, P. L. 440: Wright v. Barber, 270 Pa. 186.

During the period covered by these controversies, plaintiff was a manufacturer at Lock Haven, in this State, and purchased, for use in its plant there, a large quantity of coal, from certain coal mining companies, operating in the Munson and Hawk Run Districts, in Clearfield County, also in this State; the coal to be delivered to plaintiff f. o. b. cars of the defendant railroad, and to be paid for at certain prices, according to "original railroad weights," or "actual railroad weights on scales nearest loading point." The arrangement for the carriage was made with defendants, who hauled the coal from the mines to Bald Eagle Junction, otherwise known as Mill Hall, and there delivered it to the Pennsylvania Railroad Company, which carried it to Lock Haven. When it left the mines, it was weighed at the tipples of the particular mining companies, this being done while it still contained considerable slate, sulphur and other impurities; but these were removed before it was put on defendants' cars. The difference between the two weights was considerable, and defendants' coal traffic manager admitted in writing that "it is a physical impossibility to secure accurate weights from shipper's tipple record, in view of the fact that the cleaning of the coal is done after the mine cars have been weighed on the tipple."

The tariff filed by the defendant railroad with the Public Service Commission, and posted as required by statute, contained a notation that "way-bills [are to be] issued from [its] Avis Scales to Mill Hall," they being the nearest scales to the mine fields in question. This notation meant that the cars were expected to be weighed, while moving over those scales, before proceeding to Mill Hall, and that the total freight charges would be

calculated upon the weights thus ascertained. The freight rates fixed by that tariff, and also the one in force on the Pennsylvania Railroad Company's branch from Mill Hall to Lock Haven, called for payment of a specified number of cents per gross ton of coal carried, which necessarily meant that the rate was to be applied to the actual quantity of coal in the railroad cars. It is admitted that it was the duty of defendants, as initial carriers, to weigh the coal, after the impurities had been removed, and that the weight, thus ascertained, constituted the "original railroad weights" referred to.

In connection with the shipments, the defendants at first used a running slip, and later a combined running slip and waybill, each of these covering transportation from the mines to the junction only. Copies thereof were delivered to the coal companies and to the Pennsylvania Railroad Company; the latter, accepting the figures given in them as accurate statements of the railroad weights of the coal, issued waybills from the junction to Lock Haven. After the railroad administration assumed control of both roads, a through waybill was issued, covering the carriage from the mines to Lock Haven; copies also being delivered as formerly.

For a short time the defendant railroad weighed the coal, and the running slips and waybills specified "railroad weights," but thereafter,—and continuing until the end of the period covered by these disputes,—they did not do so, except in a few instances, without notice to plaintiff, admittedly using tipple weights only, and billing the coal at those weights, although the bills themselves stated on their face that they had been issued at the Avis scales, and indicated that the particular cars designated would move "from Avis scale to Mill Hall," the junction point. An attempt is made to excuse this on the ground that an extra haul would have been required to take the cars over the Avis scales, and then return them to the line of travel, it being averred that this was impracticable during most of the time, all rail-

roads being then pressed to their utmost capacity, because of pre-war and war conditions. This is not a legal excuse for billing the coal at tipple weights, however. Defendants knew they had no right to be paid according to those weights, and hence, if the reason stated was true, should have notified plaintiff of the difficulty, and attempted to reach an agreement upon a proper allowance, failing which, they should themselves have made such an allowance as their best judgment dictated, subject to future judicial adjustment, if necessary. In the few instances referred to, where the coal was weighed by or for defendants, railroad weights were given,—a most significant fact in connection with appellant's erroneous contention that, because of the pressure on their operating department, they were entitled to be paid according to tipple weights.

There was no joint rate for the entire carriage; each railroad had a proportional rate for its own line, and the two constituted what is known as a through rate. Although, as stated, the arrangements for the carriage was made with defendants, the freight was not paid to them, but, at or following the time of delivery of the coal to plaintiff, it was paid to the Pennsylvaia Railroad Company, which was acting merely as a collecting agent (a finding of fact not challenged by any assignment of error), and which later made settlement with defendants. The amount collected was the specified number of cents per gross ton, fixed by the tariffs of both railroads, and was, of course, excessive, because the tipple weights were taken, instead of the actual weights of coal carried.

The mining companies, taking the weights specified in the running slips and waybills, sent their bills to plaintiff, founded on these weights, for the price of the coal; these bills were also excessive, because based on tipple weights, instead of "original railroad weights," as provided in the contracts. It is alleged by appellants that these companies knew they were sending bills based on

tipple weights, and the court below has so found. It is inconceivable that it could have been otherwise, but the matter is an immaterial one here.

Finding by comparison that the running slips and waybills showed exactly the same weight of coal as the coal bills (which also they should and would have done if based on railroad weights), plaintiff paid both classes of bills, and continued to do so until it discovered it had been wronged. Appellants claim that plaintiff knew, or by the exercise of reasonable diligence could have ascertained sooner, that tipple weights were being used, and hence, was guilty of such laches as to prevent recovery. Upon ample evidence, the court below found that plaintiff had no such knowledge, and that finding is binding on us: Hardinge v. Kuntz, 278 Pa. 232. Indeed, defendants' coal traffic manager, on June 17, 1919, which was shortly before the discovery that tipple weights were being billed, admitted in writing that "None of our people directly or indirectly have had the matter brought to the attention of the consignees [plaintiff]." Moreover, the answers do not aver laches; nor do they assert that plaintiff had knowledge of the wrongful conduct of defendants, although they are careful to state that the Pennsylvania Railroad Company and the coal companies had such knowledge.

An attempt was made to settle the controversy, but this having failed, plaintiff brought the present suits to recover (1) the excessive amounts paid the Pennsylvania Railroad Company, as collecting agent for the defendant company, for carriage from the mines to Mill Hall, (2) the excessive amounts paid the Pennsylvania Railroad Company, for carriage from Mill Hall to Lock Haven, and (3) the excessive amounts paid the coal companies for the coal itself. As the predecessor of the defendant, James C. Davis, agent, was the operating agent for both railroads, during the period of the government railroad administration, and the total freight from the mines to Lock Haven, was then paid to him,

there would seem to be no doubt of plaintiff's right to recover the second of these items, in the suit against James C. Davis, agent. Because of this, we have the single difference between the two cases, hereinbefore referred to.

From what has been said, it is clear that plaintiff is entitled to recover for the first of these items from both appellants, and this they expressly admit in their briefs. Our primary inquiry is, therefore: Is it entitled to recover from the defendant railroad the excess freight charges paid the Pennsylvania Railroad Company for the portion of the haul over its own tracks? This is hardly challenged now, and there would seem to be no doubt upon the point. It would be difficult to find a case more clearly showing that a payment was the natural and probable consequence of the wrongful conduct of a defendant,—the legal test in this class of cases: McCauley v. Logan, 152 Pa. 202. Defendants knew plaintiff was only bound to pay, for the carriage over both railroads, a certain rate per ton on the coal actually hauled. They knew that the duty to ascertain the gross tonnage rested on them, as the initial carrier. They knew the total freight charges for carriage over both roads, would be calculated on the tonnage specified in the running slips and waybills which they issued. They knew that those running slips and waybills were false, in that they set forth tonnage much in excess of that actually carried; yet they persisted in their wrongful conduct, although they also knew it would certainly result in plaintiff making excess payments for the whole carriage.

There was some question as to whether or not the excess tonnage was properly calculated. The coal had all been consumed, and it was impossible to ascertain its exact weight, which, therefore, had to be approximated. Defendants were the wrongdoers, and all doubts arising from the impossibility of now exactly determining the amount of the loss, must be resolved against them:

United Drug Co. v. Kovacs, 279 Pa. 132. Their tariff provided that the "minimum weight is 2,000 lbs. less than marked capacity of car on all sizes of coal larger than slack." In fixing the tonnage of the cars, which had been wrongfully billed, the court below treated the minimum tonnage, as thus provided for by the tariff, as the actual tonnage, and charged defendants with the fixed rate per ton on the difference between it and the tonnage billed and paid for. The figures as to these matters were agreed upon between the parties, and there is nothing in the record to enable us to restate the amounts, even if otherwise we could do so; hence, if the method adopted was a fair one, these excess payments became fixed factors, namely $7,932.30 in the case of the railroad company, and $10,094.03 in the case of James C. Davis, agent. The course pursued was fair; defendants having deliberately given false weights, cannot properly ask a chancellor to presume that the actual weights were greater than the minimum weights specified in the tariff, and there was no other evidence that they were in fact greater, unless the tipple weights, taken by those who were also intentionally wronging plaintiff, are used as a basis, and this the court below was not obliged to do. Hence it was fully justified in holding that defendants were entitled to be paid for the use of the cars on the basis of these minimum carload weights only. If this method results in defendants paying more than would have been required, had the true weights been known, it is because of their own wrongdoing, and they have only themselves to blame. Had they notified plaintiff when they made the change from railroad weights to tipple weights, the coal could thereafter have been weighed on the Pennsylvania Railroad scales at Lock Haven, as has been done since the fact of overcharge was discovered; defendant's concealment of their wrong prevented this being done during the entire period, and hence they must bear the loss, if any, occasioned thereby.

In determining the loss growing out of excess payment for the coal, a different method of calculation was adopted, but we need not consider it, since we have reached the conclusion that these defendants are not liable for this item of plaintiff's claim. The court below found as a fact that defendant knew the coal companies were using the weights appearing in the running slips and waybills, and also knew of the character of the contracts between plaintiff, and the coal companies. The evidence on the latter point is meager and unsatisfactory, but it is not necessary to review it. If we assume the fact to be so, it does not follow that defendants are liable for the excess payments on the coal. True, the errors in the running slips and waybills furnished the coal companies with the opportunity to wrong plaintiff, but this was a new and independent wrong, which cannot properly be said to have been within the contemplation of defendants when those papers were furnished. The evidence does not justify the conclusion that defendants were under obligation to either vendors or vendee, to weigh the coal in order that the accounts for its purchase could be properly adjusted, or even that the documents were given to the coal companies to enable them to make out their bills. They seem rather to have been furnished as receipts for the coal delivered to defendant, as had been the custom for a period of time long antedating any of these agreements, and steadily followed, as to all such shipments, irrespective of the terms of the contracts of purchase. There was no legal reason for defendants departing from that custom, especially as to have then done so would have put an additional burden on them, at a time when they were under the greatest stress. Having no such duty, the only other thing they could have done would have been to notify plaintiff that they had discovered the coal companies were wronging it, but this they were not required to do. The contention then necessarily is, that although defendants were under no obligation to notify plaintiff, they are nevertheless

liable because they did not do it. We know of no legal principle which requires us to so hold. Their erroneous supposition that they were justified, under existing circumstances, in failing to weigh the coal, and in charging and receiving more freight than was their due, furnishes no reason for extending the effect of that error to liability for an independent wrong, even though the error itself gave the coal companies the opportunity to commit that wrong. A defendant is liable only for results which ordinarily, and in the natural course of events, flow from his wrongdoing (Hillsdale Coal & Coke Co. v. Penna. R. R. Co., 229 Pa. 61); surely it cannot be said these defendants should naturally have supposed that the coal companies, with full knowledge of the truth, would use these papers as a means whereby they could still further injure plaintiff. If a conspiracy had been pleaded and proved, a different question would arise; but the bills in equity were so drawn as to expressly exclude this idea, for they aver the coal companies were purposely omitted as defendants, because "plaintiff is informed, believes and therefore avers that [they were] ignorant of the fact that defendant was not weighing the coal and was fraudulently reporting incorrect weights."

The decrees of the court below are modified by reducing the amount payable by the New York Central Railroad Company to $7,932.30, and that payable by James C. Davis, agent, to $10,094.03, with interest on each sum, to be assessed in the court below; as thus modified, the decrees are affirmed and the appeals are dismissed, but without costs in this court.