THE TRANSFER NO. 2 and CAR FLOAT NO. 12.

WISHING v. THE TRANSFER NO. 2 and CAR FLOAT NO. 12.[1]

(District Court, S. D. New York. April 29, 1893.)

COLLISION—VESSEL BREAKING ADRIFT—FASTENINGS—STORM—ICE FLOE.
Where a railroad float, at the commencement of an extraordinary storm, was moored in a slip in the East river, and held her place through two

---

[1] Reported by E. G. Benedict, Esq., of the New York bar.

full tides, but was afterwards broken adrift by a large floe of ice, which came up the river, and the evidence indicated that the float was sufficiently fastened, and that such a body of ice was not reasonably to be anticipated in that locality, and its appearance was without warning, *held*, that neither the float, nor the tug in charge of her, was liable for the damage caused by the float's colliding with libelant's boat.

In Admiralty. Libel by John Wishing against the steam tug Transfer No. 2, and Car Float No. 12, for a collision. Libel dismissed.

Carpenter & Mosher, for libelant:

Cited The John Tucker, 5 Ben. 366, 369, 370, and cases cited in the opinion; The Louisiana, 3 Wall. 164; The Barges Energy and M. F. Winch, 10 Ben. 158; The Schooner Christopher Columbus, 8 Ben. 239, 241; The Lotty, Olcott, 332, 333; The Johannes, 10 Blatchf. 478; The Wier v. Padre, 29 Fed. Rep 335; The Bark Lilian M. Vigus, 22 Fed. Rep. 747.

Benedict & Benedict, for claimants.

BROWN, District Judge. At about 6 o'clock A. M. of March 13, 1888, during the extraordinary storm known as the "Blizzard," a railroad float, which was moored in the slip between piers 6 and 7, East river, broke her bow fastenings and swinging downward, came in collision with and damaged the plaintiff's boat, for which the above libel was filed. The faults alleged are improper and insufficient fastenings.

The float was loaded with railroad cars, and had left Harlem the previous day in charge of Transfer No. 2, bound for Jersey City. Meeting with very heavy weather, she had been obliged to put in at Greenpoint. Finding her position there untenable, she afterwards came down the East river expecting to find a suitable place on the New York shore, but was unable to effect an entrance at two or three places tried in succession. At about 4 P. M., when a little below the Brooklyn bridge, she was met by her sister tug Transfer No. 3, and with the latter's help was able to effect an entrance in the slip between piers 6 and 7, the only one apparently available. They, could not go on around the Battery, and get across the river.

The float was about 225 feet long. I find, upon the evidence, that she was moved as far up in the slip as was safe, having reference to the canal boats immediately ahead. Alongside pier 7 was a schooner, about 125 feet long; next outside of her and on her midship and quarter was a lighter. The float came in outside of both. Her stern projected about 10 feet beyond the end of the pier; and next to the pier and behind the stern of the schooner lay Transfer No. 2. The tide at the time was ebb. The stern of the float was made fast by lines fastened to a bitt near the stem of the schooner, and there were other breast lines to the lighter. The float thus moored remained in safety for at least 13 hours, covering two full tides.

The fierceness of the storm had much abated before 6 o'clock in the morning, when an immense floe of ice, according to the testimony of the pilot, came up the East river, and catching the stern of the float, forced her stern towards pier 7 with such force as to

cause a swinging strain on the bow sufficient to break all the lines that fastened her to the schooner. There had not previously been any ice in the river. During the day it came in in such quantities that people passed across the river, an extraordinary occurrence that happens only once in many years. In the several cases cited for the libelant, where vessels have been held responsible for breaking loose from their moorings, all of which I have examined, there were present plain indications of the special danger which ought to have been guarded against; and it was for the neglect of those evident dangers that the vessels were held responsible. In several of the cases there was floating ice, the danger from which was obvious at the time when the vessel was moored. In others, not only was the special danger obvious, but there was abundant time and means to guard against it.

For the libelant it is contended that the parting of the lines was caused by chafing upon the schooner's bitt. The weight of evidence is clearly to the contrary. The lines were repeatedly visited and examined on the schooner by the float's men for the express purpose of seeing whether there was any chafing, and none was found. The general sufficiency of the fastenings for all times of tide is proved by the fact that during two full tides and through the worst of the storm her position was maintained without change. The testimony as to the sudden appearance of an immense sheet of ice is not contradicted. It was an extraordinary occurrence, not reasonably to be anticipated. There was no previous ice to suggest the necessity of taking precautions against it, certainly none as respects such an immense floe as came in with the morning flood. This distinguishes the present case from all those cited. There was no time to provide any additional securities after this floe was seen coming; and the accident should, therefore. be, in my opinion, ascribed, not to the omission of any reasonable precautions in fastening, but wholly to the extraordinary occasion, and to this almost unexampled storm and cold. See The Brooklyn, 4 Blatchf. 365; The John Tucker, 5 Ben. 366; The Energy, 10 Ben. 158. The libel must, therefore, be dismissed.