### THE WATERLOO and THE GLENALVON.

#### (Circuit Court of Appeals, Third Circuit. February 16, 1900.)

#### No. 14.

1. COLLISION—VESSEL BREAKING FROM MOORINGS.

   A vessel which breaks from her moorings and drifts against another, to relieve herself from liability for the injury, has the burden of proving that the breaking away and drifting were excusable.

2. SAME.

   Two large vessels were moored side by side to a wharf on the Schuylkill river, off Point Breeze; being made fast to eight posts which stood along the edge of the wharf. During a sudden wind one of the posts pulled out. A careful examination of the remaining posts was made, but disclosed no weakness. On the next day there was heavy rain and high wind, and another post pulled out. The vessels could not then be moved without peril to themselves and to others, but lines were taken to the only other available post. The storm continued, and the river rose to an unprecedented height, causing a vertical strain on the posts; and on the following morning the remaining posts pulled out, and the vessels drifted, dragging their anchors, which had been dropped, and struck and injured two other vessels, moored on the opposite side of the river. Held, that the vessels doing the injury were not liable, having taken all the precautions practicable: that it did not appear that it would have been practicable to carry an anchor ashore and imbed it in the earth after the first posts gave way.

Appeal from the District Court of the United States for the Eastern District of Pennsylvania.

For opinion in district court, see 79 Fed. 113.

John F. Lewis, for appellant.

J. Rodman Paul and Theodore M. Etting, for appellees.

Before ACHESON, DALLAS, and GRAY, Circuit Judges.

GRAY, Circuit Judge. This is an appeal from the decree of the district court for the Eastern district of Pennsylvania in the case of the master of the British ship Norwood against the British ships Waterloo and Glenalvon. The action was an action in rem, in a cause of collision, brought in the first instance against the British ship Waterloo alone, the master of which, by petition under the fifty-ninth admiralty rule of the supreme court, brought in the owners of the British ship Glenalvon as co-defendants. The principal facts in the case, and not specially disputed, as disclosed by the record, are these: Several days prior to the 21st of May, 1894, the ship Waterloo, being then light and awaiting cargo, was ordered to Point Breeze, on the Schuylkill river, to the Girard Point Storage Company's wharf, on the eastern side of the river, to take on a cargo of case oil. On arrival, the wharfinger of the company, who was also the city harbor master, ordered the Waterloo to a position outside and alongside of the ship Glenalvon, already moored at the wharf, and likewise awaiting cargo. The wharf at Point Breeze, where the vessels were moored, was almost entirely covered by buildings, with 15 or 20 mooring posts projecting from the cap log of the wharf, some four or five feet in height. The Glenalvon and Waterloo, both being light and standing high up out of the water, were securely moored by strong wire and hemp hawsers to no less than eight of these posts. Just ahead of the Glenalvon lay the Tam O'Shanter, and just astern of the Glenalvon and Waterloo lay the barks Constance and Amoor in double line. A slight jog or extension of the wharf projected above these last-named vessels, and above this, also moored in double line, were four or five other vessels. All these vessels were lying head down the stream on the eastern bank of the Schuylkill river, which just above that point bends sharply to the westward, and is exceedingly narrow,—not more than 350 or 400 feet wide. On the western side of the river, directly opposite to the Glenalvon and Waterloo, lay in double line the bark Francesco R. and barge No. 58, while ahead of this barge, and somewhat further down the stream than the Waterloo and Glenalvon, lay the ship Norwood. Prior to Saturday, May 19th, there had been a long spell of rainy weather. Saturday was clear until the afternoon, and the vessels (the Glenalvon and Waterloo, among them) took advantage of the fine weather to loosen and dry their sails. The Waterloo had its full complement of officers and crew on board. The sails were not taut, but clewed up with bunt lines and clew lines. In the afternoon a thunder gust occurred, and a sudden puff of wind caused one of the eight or more posts to which the stern lines of the Waterloo and Glenalvon were fastened to pull out. The sails were at once furled, the vessels put back by tug-boats to the wharf, and the lines taken to another post astern. A careful examination of the posts upon the wharf showed no signs of weakness, and nothing to indicate that the pulling out of the post mentioned was not an accident due to the condition of that post alone. Saturday night the rain began again, and on Sunday, the 20th, there was rain and considerable wind all day, with a velocity of from 22 to

29 miles. Shortly after noon another post, to which the stern lines had been fastened on Saturday, pulled out from the wharf, whereupon the Waterloo and Glenalvon were again made fast by two lines and a wire to another post, still further astern, and beyond the bow of the Constance. Extra lines had also been taken out from the bows to a buffer and post on the wharf ahead of the Glenalvon and some distance inshore. On Monday, the 21st, after an incessant rain all night, there was a freshet in the Schuylkill. The flood did much damage along the river front. The water rose to an unusual height, and it is in evidence that several feet of water overflowed the rooms of the Baltimore & Ohio Railroad station, and that the high-water mark was nearly a foot higher than that of the greatest freshet theretofore recorded, in 1869; that about 9 o'clock in the morning of Monday other posts, to which the Waterloo and Glenalvon were moored, began to pull out or show signs of weakening. The sterns of the vessels had been allowed to swing out some little distance from the wharf, and it is in testimony that this was done to ease the vertical strain upon the posts caused by the lifting of the vessels above them by the flood. The wharf was covered with unsubstantial wooden buildings or piles of lumber. There were no posts or trees inshore to which additional lines could be led. The heavy bow anchors of the Waterloo and Glenalvon had been dropped underfoot, but the force of the current, coupled with the fact that the posts were not deeply set into the ground, or properly fastened below to the crib of the wharf, caused the two vessels, still lashed together, to draw out the remaining posts, leave their moorings, and drift with the current across the river. Only one line parted, when the full strain was brought upon it alone. All the other lines remained fastened to the tops of the posts that had pulled out. The heavy anchors were dragged by the current, and did not avail to hold the ships. Thus drifting against the Norwood, on the opposite side of the river, the collision caused that ship to break away from her moorings, and drift down the stream, resulting in the damage complained of in the libel. The captain of the Norwood filed a libel against the Waterloo, charging her with failure to adopt proper measures to secure herself from drifting; and the Norwood proceeded, also, against the Girard Point Storage Company, charging it with negligence in not providing sufficient mooring posts. The ship Francesco, lying upon the same side as the Norwood, was also damaged by the collision, and a libel in her behalf was also filed against the Waterloo. The master of the ship Waterloo also filed his petition in the said district court, alleging that, if the ship Waterloo was in fault for said collision, the ship Glenalvon was equally in fault, and praying that J. R. De Wolf & Son, the owners, might be made parties to the said cause, in accordance with rule 59 of the supreme court rules in admiralty, and in accordance with said petition the said owners of the Glenalvon were made parties to said cause. The suits were heard together, and a decree was entered dismissing the libel against the Waterloo, and the latter's petition to bring in the Glenalvon, but sustaining the libel against the Girard Point Storage company. An appeal from the decree against the storage company was taken to this court, and in February 1899, this court re-

versed the decree of the district court, and ordered the libel against the storage company to be dismissed.

The charges of negligence covered by the assignments of error urged in argument by appellant (libelant) are that the Glenalvon and Waterloo were negligent, under the circumstances, (1) in having their stern lines fastened to but one post; (2) in failing to get out anchors astern; (3) in having their sails loosed upon Saturday, during the storm of that day, and thus unnecessarily straining their mooring posts; (4) in having their sterns about 20 feet out from the wharf, at an angle into the current of the river; (5) in failing to slack off their bow lines, and by so doing swing close into the wharf; (6) in failing to move to a safe place before it became impossible to do so. It is also urged by libelant that the burden of proof is upon the ships to show that they broke away from their moorings without any negligence upon their part, and it cites the cases of The Louisiana, 3 Wall. 164, 18 L. Ed. 85; The John Tucker, 5 Ben. 366, Fed. Cas. No. 7,431; The Fremont, 3 Sawy. 571, Fed. Cas. No. 5,094. This is true, in the sense that it must appear from the evidence that the breaking away or drifting was excusable, in order to relieve the vessels so breaking away from liability; and this is the meaning of the cases cited. A careful reading of the testimony does not, in our opinion, disclose a culpable negligence on the part of either the Waterloo or Glenalvon, in the manner in which they were moored to the wharf. It is in evidence that both the Glenalvon and the Waterloo were assigned their berths (the one alongside and next to the wharf, and the other immediately outside of her) by the harbor master,—the officer duly authorized by law to make such assignments. The harbor master also had supervision of the mooring, and he testifies that he had had a large experience as a sailor and an officer; that he had been a chief officer for a number of years in the American Line, and had been with Mr. Gould's yacht for five years. Speaking from his experience and his knowledge of the facts, he testifies explicitly that he does not see what could have been done by the ships, in the way of mooring, other than what was done. The captain of the Tam O'Shanter, an American ship lying below and next to the Glenalvon, had observed the moorings of the Glenalvon and the Waterloo, and testifies that they were well secured, as far as lines were concerned, and were as strong and numerous, or even more so, than was usual in such cases; that they had put out extra lines on Sunday morning; and that, in his opinion, there was nothing in the fastenings of the vessels that could have been improved. The Glenalvon was fastened, with bow, stern, and breast lines, to six or seven posts; and the Waterloo was fastened by sufficient lines to the Glenalvon, and additionally with lines from her stern to the wharf. After the little squall on Saturday, which caught the ships with their sails up, drying, thus making an unusual pressure upon the lines, which resulted in drawing out one of the posts, the lines were led to other posts further up, and additional precautions taken. We do not think there is any evidence to show that, after the pulling out of the post on Sunday,

anything was omitted in the way of precaution which could or ought to have been, under the circumstances, adopted.

While it was raining heavily. on Sunday, it was never blowing very hard, and the violent culmination of the freshet on Monday morning, when the ships broke away, could hardly have been antici- pated. It is claimed that the accidents of Saturday afternoon and Sunday should have warned those in charge of the ships that ex- traordinary precautions were necessary; but it will be noted that those accidents happened, not from the parting of the lines with which they were moored, but from the pulling out on each occasion of a post not sufficiently fastened into the wharf. It appears that after those accidents lines were carried to the only other available post, and heavy anchors dropped under the forefoot of each ship. The swinging of the stern out some 15 feet or more from the wharf was, as testified to by expert witnesses, a wise precaution, to give a greater lead to the lines from the stern to the post, as when the sterns of the ships were closer to the wharf the lead of the .lines was more nearly vertical, and tended to put an upward strain on the posts, that increased the danger of pulling out.

Nor do we think that culpable negligence could be charged by reason of the failure to carry out large anchors astern on to the wharf and inshore, to be imbedded in the ground. Such anchors, with their cables, are exceedingly heavy, and would have required more than the crew of their ship to have handled them with suffi- cient quickness, after the damage became apparent; and it is in testimony, by competent seafaring men, that a small kedge anchor would be unavailing. The loosening of the sails on Saturday in order to dry them was, according to all the testimony, a perfectly proper and usual thing for ships situated as they were to do. It does not appear that they were loosened during the storm, but when the skies were clear, and that it was a squall, which lasted only for a half hour, that caught the ships with their sails up, and, blowing offshore, put the extraordinary strain upon their mooring lines that resulted in the pulling out of one of the posts. Nor do we find that it would have been possible on Monday to have moved the ships to a safer place than that in which they were, or that there was any occasion to so move them on Saturday or Sunday, even if a safer place could have been found.

We have not overlooked, in the record, the testimony produced by appellant, and which conflicts with some of that upon which these conclusions are founded. We have carefully read and considered all the testimony on both sides, and have stated what we consider its preponderating weight to be, in view of all the facts touching the experience, opportunities of observation, and general intelligence and bias of witnesses, as disclosed by the record. We are of opin- ion, therefore, that the libel was properly dismissed by the court below, and the decree to that effect is affirmed.