THE WILLIAM E. REIS. THE JOHN W. MOORE. THE FANNY
NEIL. THE JAMES B. EADS.

(Circuit Court of Appeals, Sixth Circuit. April 4, 1907.)

Nos. 1,606–1,608.

**1. COLLISION—VESSEL BREAKING FROM MOORINGS—NEGLIGENT INATTENTION TO
LINES DURING FLOOD.**

The William E. Reis, a large modern steamship, having on board 4,800
tons of iron ore, which lay moored for the winter at a dock in the Cuya-
hoga river, at Cleveland, broke from her moorings by reason of the part-
ing of her lines during a flood following a heavy thaw, with rain, and
drifted against and injured other vessels moored below. The river had
been rising for two or three days, and due warning of the approaching
flood had been given by the press. Only one person was kept on board as
shipkeeper, and he was unable alone to manipulate the lines to equalize
the strain thereon as the vessel was lifted by the rising water, and the
evidence tended to show that the lines broke because of the unequal strain
thereon. There were 50 other vessels moored in the river, none of which
broke loose. *Held*, that such facts did not sustain the burden of proof
resting on the vessel to show affirmatively that her drifting was the re-
sult of inevitable accident, or a vis major, which human precaution and
a proper exercise of nautical skill could not have prevented, but that,
whether or not her fastenings were originally sufficient, they ceased to be
so when the flood came, especially in view of her great weight, and the
failure to take precautions to make and keep them so rendered her liable
for the resulting damages.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Collision, § 85½.]

Appeal from the District Court of the United States for the Eastern
Division of the Northern District of Ohio.

For opinion below, see 143 Fed. 1013.

H. D. Goulder and F. L. Leckie, for appellant.

R. M. Lee, for the John W. Moore and the Fanny Neil.

G. W. Cottrell, for the James B. Eads.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

RICHARDS, Circuit Judge. About 8 o'clock on the morning of
January 22, 1904, the William E. Reis, a large modern steamship,
which lay moored for the winter at the River Furnace dock, a short
distance above the Columbus Street Bridge, in Cleveland, broke from
her moorings during a freshet or flood following a heavy thaw, with
rain, and drifted down the Cuyahoga river in a current of four or five
miles an hour. A short distance beyond this bridge she struck and
slightly damaged the barge Fanny Neil, then struck and broke adrift
the steam propeller John W. Moore, which in turn struck and broke
adrift the steam propeller John B. Eads, and the Reis, with the Moore
and the Eads, drifted down the river till they brought up against the
Superior Street Viaduct, where the Moore was sunk and the Eads
badly damaged.

In the libels a number of faults were charged against the Reis, among
others the lack of sufficient winter moorings, a failure to take proper
precautions to prevent her going adrift in the rising flood, and the
neglect to place her in charge of a competent and careful shipkeeper,

with authority to call for help, who could and would oversee her fastenings, and make such alterations and adjustments as the changing conditions resulting from the rising river should from time to time demand. The answer of the Reis set up "inevitable accident," alleging that her moorings when she was tied up were proper and sufficient under all the conditions that might then have been reasonably anticipated, that she was provided with a proper and suitable shipkeeper, and that she broke away because of an unprecedented flood, which put her fastenings under a strain which was not anticipated and could not be provided against. The court below rendered a decree in favor of the libelants, but placed it upon the ground that the Reis and her owners were at fault in not manipulating her moorings and in not loosening or tightening her lines and cables in a proper and seamanlike manner during the critical hours of the rising flood immediately preceding the accident.

As to the character of the original moorings, the court expressed the view that there was great conflict in the testimony; but, giving full weight to it all, it would appear that the fastenings were such as would satisfy a prudent navigator that they were sufficient, if kept in proper adjustment, to repel the force of any flood reasonably to be apprehended. The court did not go further into this conflict, placing its opinion, as we have indicated, upon the neglect of the Reis to keep the fastenings in the proper adjustment during the critical period of the flood. The Reis was 436 feet long over all, 50 feet beam, and 28 feet depth. She came to the River Furnace dock laden with about 6,500 tons of iron ore, and before she broke away about 1,800 tons had been removed, so that at the time she went adrift she had about 4,800 tons of ore on board. Her master and crew left her about December 12, 1903, leaving her in charge of one Coyne as shipkeeper. Coyne was a young man about 20 years old. He had sailed about 5 years as an oiler, watchman, and second cook. The fastenings which held the Reis to the dock were described by her captain, and as stated in the opinion of the court below they were as follows:

"An 8-inch manila line, leading ahead some 30 feet from her forward starboard tow chock, to a pile on the dock. The first fastening abaft of this was six parts of a 6-inch manila line, leading from the breast chock in the windlass room to the dock timbers on the dock; three of these parts leading quartering ahead, and three parts about 45 degrees forward of abeam. From her forward deck engine, a short distance abaft of her forward house, she had a ⅞-inch steel cable leading ahead and one astern; also three parts of a 6-inch manila line leading ahead. From her amidships timberhead, abreast of her amidships deck engine, she had a ¾-inch wire cable leading ahead. From her after deck engine, she had a ⅞-inch steel cable leading ahead, and another one astern; and from the same chock she had two parts of a 6-inch line leading ahead. From the after chock she had three parts of a 6-inch line, two leading ahead and one leading astern. These lines were all made fast to dock timbers and piles on the dock; and, where bights were put out, these were fastened around dock timbers with toggles. The lines had various leads, some short and some long; but it is impossible, from the testimony, to give their definite length."

There are some discrepancies between this statement and the fastenings given in the answers; the principal one, it seems to us, growing out of the different location of the vessel. According to the captain, when the vessel was first tied up, she was against the dock, both for-

ward and aft, but away from the dock amidships some 10 feet, because of a bend in the dock. On Thursday, before she broke away, she was substantially against the dock aft, but her straight side forward was away from the dock from 8 to 10 or 12 feet. It was a matter of doubt as to what caused this, whether a shoal place near the dock or the presence of some obstruction. At any rate, after the rise came Thursday night, the vessel cleared the obstruction, whatever it was, and, before she broke away, came up close so she was against the dock forward.

It appears from the testimony that there was an unusual covering of snow and ice, with cold and freezing weather, up to January 19th, when the temperature arose to 40 degrees above. It began to rain heavily and thaw from that time till the 22d. The river began to rise during Wednesday night. The ice broke up, and the snow melted and disappeared Wednesday. During Thursday the water arose rapidly, until by 4 or 5 o'clock that afternoon, it had arisen to a height of 2 or 3 feet at the River Furnace dock, where the Reis lay. By this time the press had given information of the threatening conditions, and extra precautions were being taken by those in charge of vessels moored in the river. An examination of the fastenings of the Reis was made by several masters of what is called the "Corrigan Fleet," some of which lay close below, and they testified that in their opinion the fastenings were sufficient, in view of the conditions then existing and to be expected. It appears that there was a so-called shore captain of the Reis, who lived aboard another vessel some distance away. He came to see the Reis on Wednesday, two days before she broke away. He satisfied himself that she was all right, went back to his comfortable quarters, and stayed there until he heard that the Reis and her victims had brought up against the viaduct bridge. So that the responsibility for handling the Reis during Thursday night, when the flood was really on rested upon the shipkeeper, Coyne. Coyne was on board with a friend of his, who was not a sailor man, so the entire work in the management of the fastenings was left to Coyne.

Coyne testified that his attention to the rise in the river was first called by the strain upon the lines, which he noticed Thursday night, some time between 9 and 12 o'clock. The vessel then came up forward closer to the dock than she had been. Coyne then went back and found the strain on the aft breast line; "more strain on that than the others," so eased that off a little. That was the first line he surged. The line was made fast to the timberheads on the starboard side. He slacked it probably some inches. It might have been less than a foot; it might have been more. He could not say. This was probably between 10 and 12 o'clock at night. The next thing he did was to slack the cable amidships leading ahead. He "slacked that wire next." He took a couple of turns off, and slacked it away a little. He took the turns off the timberheads. After he slacked the cables, he did not do anything for a couple of hours. After midnight he went forward and slacked away the 8-inch line. That was after 1 or 2 o'clock in the morning. He probably slacked that 6 or 8 inches. Then he found that the lines were all about on an equal strain as near as possible, and he went back to get something to eat. This was the extent of the manipu-

lation of the fastenings by Coyne. When the Reis broke away, no dock timber or pile, and no part of the dock, broke or gave way, and no timberhead or other fastening on the Reis broke or gave way, but the lines and the cables on the Reis parted. It appears that as the water rose the forward part of the Reis went in tight against the dock. As a result the stern was forced out, the strain upon the lines aft became so great that they parted, the stern swung out into the river, and then practically immediately the boat went adrift.

But it is contended that since the shipkeeper was as good a man as is usually employed in that position, and since he did all he could, and nevertheless the boat went adrift, it was not his fault, or that of the owners, and must be charged up to inevitable accident. If we believed that under the circumstances, the owners ought not to have anticipated any difficulty in manipulating the fastenings of this vessel which Coyne would not be able to cope with, then we should concede the strength of the argument. But this was not the ordinary case. It does appear in the testimony that usually one shipkeeper alone would be employed for a vessel, and sometimes, not even one. Not infrequently one man would take care of a number of vessels. But these were all vessels which had been unloaded, and were tied up securely, so that it was not necessary to do more than guard them against thieves, and give warning of any unexpected conditions requiring additional aid to care for the vessel. In the present case, however, three-fourths of the cargo was still aboard. The vessel was tied up with ropes and cables. At first she was against the dock both forward and aft. Later, at the time the flood began, her position for some reason had been shifted, and she was from 8 to 12 feet away from the dock forward. She was an unusually large vessel, carrying a heavy cargo, that must have put an enormous strain upon her fastenings. Under these circumstances, ordinary care required the exercise of constant vigilance in order to keep the moorings properly adjusted and the strains equalized. The heavy current tended to alter the position of the vessel, and the strains thus caused were heightened and complicated by those due to the rise in the water. The weight of the testimony was to the effect that under the existing conditions one man could not handle the fastenings of the Reis. It required five or six. If it required five or six, then it was the duty of the Reis and her owners to provide that many. Sufficient warning was given, and there was no justification for running the risk of allowing a large vessel like this to run amuck where 50 or more were safely moored, yet liable to be cut down and sunk in case of disaster.

This case involves no new doctrine. The rule applicable is stated in The Louisiana, 3 Wall. 164, 18 L. Ed. 85, as follows:

"The collision being caused by the Louisiana drifting from her moorings, she must be liable for the damages consequent thereon, unless she can show affirmatively that the drifting was the result of inevitable accident, or a vis major which human skill or precaution and a proper display of nautical skill could not have prevented."

Whether the moorings of the Reis were originally sufficient or not, they certainly ceased to be so when the high water came, and there was no one on board who could and did adjust them so as to relieve them from the unusual and heavy strains to which they were then

subjected. The other shipkeepers either moored their vessels better, or they knew better how to care for their fastenings under a strain; for, of the 50 there, the Reis was the only one that broke loose and went adrift. We think the fault was with the Reis. If she had been made secure, she could have been kept secure by proper attention. She was neglected at a critical time, with the usual result.

The judgments are affirmed.