## THE C. H. NORTHAM.

### (District Court, D. Massachusetts. August 17, 1909.)

### No. 88.

SHIPPING (§ 208*)—VESSEL BREAKING FROM MOORINGS IN STORM—INEVITABLE ACCIDENT.

A steamer owned by petitioners was placed by them on the beach, where she had been for several weeks, and had been partially broken up and her machinery removed, when during a storm and high tide at night she floated, broke from her moorings, and drifted across the bay. She did not float at ordinary high tide, and lay in a hollow, with a bank between her and the sea. She was made fast by five hawsers, three of which parted, and the others slipped from their fastenings. A watchman was on board. The storm and height of the tide were extraordinary, and exceeded any that had been known for several years, and many other vessels dragged their anchors or broke from their moorings. The direction of the wind at high water was such as to force the vessel off shore, but in most storms occurring at that time of year the wind blows on shore. *Held:* (1) That there was no absence of reasonable care or skill on the part of petitioners, which would charge them with privity or knowledge, such as to prevent them from limiting their liability; and (2) that the breaking away of the steamer was due to inevitable accident or vis major, and she could not be held liable for injuries to other vessels into which she may have drifted.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 645; Dec. Dig. § 208.*]

In Admiralty. Petition for limitation of liability by Thomas Butler and others, as owners of the steamer C. H. Northam. On questions of petitioners' privity or knowledge, and their liability for damage to claimants. Decree for petitioners, and claims dismissed.

See, also, 181 Fed. 983, 985.

Carver, Wardner & Goodwin, for petitioners.
Edgar O. Achorn, for claimants.

DODGE, District Judge. The petitioners had placed their steamship C. H. Northam on the beach which lies north of Wood Island Park and east of the Revere Beach and Lynn Railroad bridge at East Boston, and were engaged in dismantling her there. On the night of Wednesday, November 6, 1907, during a storm accompanied by a high tide and heavy wind, she floated, broke from her moorings, and drifted in a northerly direction across the bay or cove which lies between Wood Island Park and that part of East Boston called Harbor View, until she grounded at the latter place. A quantity of beams,

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

spars, planking, and other wooden material, either taken from the Northam in the process of dismantling her or to be used in that process, and lying, when the storm came, in the water between the Northam and the shore, or on the shore alongside her, also went adrift when she did, and drifted toward the opposite shore. It was found next morning strewn along that shore for a considerable distance. The respondents Crosby, Mayer, De Gaust, and Frederick were the respective owners of certain small vessels or boats, which on the evening of November 6th were moored in apparent safety at various points between Wood Island and Harbor View, but were found on the morning of November 7th ashore and more or less damaged at or near Harbor View. The respondent Nelson owned a wharf at Harbor View and certain small boats there, also found on the morning of November 7th to have sustained some damage. The respondents contend, and the petitioners for limitation deny, that the Northam and the wooden material referred to drifted from Wood Island by reason of negligence for which the petitioners, as her owners, are responsible; also that the damage to the various craft belonging to them, or to the wharf, was the result of that negligence. They also contend, and the petitioners deny, that the petitioners are chargeable with privity or knowledge in respect to said negligence.

I first consider the question whether any negligence is established on the petitioners' part as owners of the Northam. They were, of course, bound to use due care to prevent her from getting away from her moorings. In the condition to which they had reduced her, she could not have been navigated without danger to such other craft as she might encounter, and the fact that on the night in question she was for a time found drifting about the harbor and not under control creates a presumption against her in favor of any vessel or structure that she may have damaged while so drifting. The presumption, however, is one which she may meet by showing, if she can, that her drifting "was the result of inevitable accident or a vis major, which human skill and precaution and a proper display of nautical skill could not have prevented." The Louisiana, 3 Wall. 164, 173, 18 L. Ed. 85; Eastern Dredging Co., Petitioner, 159 Fed. 549; Eastern Dredging Co. v. Winnisimmet Co., 162 Fed. 860, 89 C. C. A. 550.

In The Louisiana, above cited, a vessel moored got adrift by reason of a change in the direction of the tide and a rising of the wind. It appeared that the wind, though increased in force, was "only of such a character that its effects might have been anticipated, and by proper precaution prevented"; that it was only a "half gale," a "stiff breeze," or a "little more than the ordinary"; and that, out of numerous other vessels in the vicinity, not one was caused to break adrift by it. It was held that the presumption of negligence had not been met.

Negligence is therefore established on the petitioners' part, unless they have sustained the burden of showing (1) that they used the required degree of skill and precaution to guard against all such contingencies as ought reasonably to have been anticipated, tending to set their vessel adrift; and (2) that she was, notwithstanding such skill and precaution, caused to go adrift by the occurrence of circumstances

so extraordinary as to render unreasonable any claim that they should have been anticipated.

1. The Northam had been on the beach referred to in the same place and secured in the same way for several weeks. At ordinary high tide she did not float. This happened only on an extra high tide, and, of course, when it happened, she would remain afloat for a very short time only. She was in a bed or hollow formed in the bottom, and the bank outside her would, under all ordinary circumstances, have prevented her from drifting away, even while she did float. She was moored by five different hawsers of sizes ordinarily used for such a purpose, and the shore ends of these hawsers were made fast in various ways; two of them to large rocks on shore, two of them to posts driven into the ground, and one of them to an A frame, so called, which was secured to the shore, and which was being used to assist in the dismantling process. She had a lighter alongside on her outer side; this craft being anchored. A schooner was anchored at a little distance outside the lighter. She was attached by lines to both these craft. It appears that three of the lines attaching her to the shore parted when she went adrift, and that the remaining two dragged from around the rocks to which they were fastened; also that the lighter and the schooner dragged or parted from their anchors. The evidence regarding the fastenings used has not seemed to me to show any lack of skill and diligence on the petitioners' part in providing against all such contingencies as were reasonably to be anticipated. Of course, storms were to be expected at that time of the year. Such storms, however, ordinarily came from the northward and eastward, and no storm from those directions would have tended to part the fastenings. It would, on the contrary, have tended to keep the steamer where she was. In view of these facts, and of the bank outside the steamer, it seems to me that the petitioners have satisfactorily proved that they used the required degree of care in fastening the vessel, unless the storm which set her adrift was only of such a character that its unexpected effects ought to have been expected and anticipated. There was evidence tending to show that the hawsers used, or some of them, were not new, and not, therefore, as strong as they should have been, and that sufficient precaution had not been taken to prevent those which were fastened to rocks from slipping off or dragging under. There was also evidence tending to show that some of these deficiencies had been called to the attention of the persons in charge of the steamer before the day on which the storm arose, but without inducing them to pay any attention to the criticisms made. This evidence, however, has not seemed to me sufficient to overcome the evidence which tends to show due care. It was, of course, most important to the petitioners that their vessel should not be allowed to break adrift. The loss to them involved in her doing so would be more serious than any damages she would be likely to inflict on any one else. I do not think that any want of due care is disclosed by all the evidence regarding the hawsers or the manner in which they were made fast. A watchman was always kept on board the steamer at night, and there were two men on board on the night of the storm. When the danger of the steamer being blown off manifested itself, it was late in the even-

ing, and they had no reasonable opportunity to prevent it. They opened the seacocks when she began to float; but this did not prove sufficient. Nothing more seems to have been reasonably within their power at that time.

2. The evidence regarding the character of the storm satisfies me that the violence of the wind was extraordinary, and that the tide rose to an extraordinary height, but that in neither respect was the storm such as to be wholly unprecedented. There had been nothing like it, however, for several years, and two facts about it appear which seem to me to justify the finding that it was of such a character as to make it unreasonable to expect the petitioners to anticipate and guard against the effect which it had upon this vessel. The first is that, while the storm began as a storm from the east and northeast, and the warning published by the Weather Bureau at 10 a. m. of the same day had been a warning of a northeast storm, the wind afterward changed rapidly in direction to the southward and then to the westward, so as to blow with great violence from the latter direction at the time the tide was at its height, and thus to be forcing the Northam away from shore just when the tide had floated her and made it most possible for her to break away. The second is that a very large proportion of the other craft left at anchor off the shore, not only in that vicinity, but in other parts of the harbor, during the same night, yielded to the violence of the storm, parted their moorings or dragged their anchors, and were found stranded at various points along shore the morning after. In view of all the evidence, my conclusion must be that the petitioners have sustained the burden of proof required of them in order to entitle them to ascribe the breaking away of the steamer to causes for which they are not responsible. See Transfer No. 2, 56 Fed. 313; The Mary L. Cushing, 60 Fed. 110; The Waterloo, 100 Fed. 332, 40 C. C. A. 386, as compared with The Andrew Welch, 122 Fed. 557; The Drumcraig, 133 Fed. 804; Bleakley v. City, 139 Fed. 807; The William E. Reis, 152 Fed. 673, 82 C. C. A. 21.

If the steamer had not broken away, the timber and other wooden material above referred to would not have got adrift. It, or at least all that part of it which can reasonably be supposed in any event to have done any damage, was on the steamer's inshore side, and thus secured by the various moorings which held her to the shore, so that it would not have got adrift at all, had she remained fast to the shore.

If, as I am obliged to hold, the breaking away of the steamer and other material cannot fairly be ascribed to negligence on the petitioners' part, there was no privity or knowledge regarding it which can be charged to them. These conclusions render it unnecessary to inquire how much, if any, of the injuries sustained by property belonging to the damage claimants, could, in any event, be fairly ascribed to the breaking away of the steamer as their cause. As to some of those injuries, the evidence that they were really caused by the steamer, or by any of the material which drifted across from where she lay, seems to me far from convincing.

All the claims presented by the respondents above named must be disallowed.