## THE E. M. PECK.

(Circuit Court of Appeals, Sixth Circuit. December 17, 1915.)

### No. 2655.

COLLISION ⬬71—MOORED VESSEL DRIFTING IN FLOOD—INEVITABLE ACCIDENT.

The steamer Peck, without cargo, was moored for the winter in the river at Lorain, Ohio, in charge of an experienced caretaker. She was made fast by anchor chains at bow and stern; that from the bow, which was upstream, being carried up to a sound white oak pile 15 inches in diameter set in solid ground, the chain being sunk a foot or 18 inches below the ground and shackled. In the latter part of January a thaw, with rain, set in, causing the ice to break up, and creating a situation which was very unusual, if not unprecedented. The harbor master and caretaker, both experienced mariners, ran five additional lines from the Peck; but an ice gorge, which had formed above, broke through a bridge and, coming down against her, first parted her lines, and then the pile to which her bow chain was made fast broke off, and she was swept down, striking and injuring a dredge moored below. Of the 14 vessels moored in the harbor, 9 were swept away or cast ashore, and all but one of the others were damaged. *Held*, that those in charge of the Peck were not negligent, but exercised such care and prudence as the circumstances reasonably required, and that her drifting was the result of inevitable accident.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 101; Dec. Dig. ⬬71.]

Appeal from the District Court of the United States for the Northern District of Ohio; William L. Day, Judge.

Suit in admiralty by the L. P. & J. A. Smith Company, owner of Dredge No. 8, against the steamer E. M. Peck; the Calumet Transit Company, claimant. Decree for libelant, and claimant appeals. Reversed.

For opinion below, see 201 Fed. 599.

Prior to January, 1904, the steamer Peck, a wooden barge, 250 feet long, and 40 feet beam, without cargo, and owned by the appellant, was moored for the winter on the west bank of Black river, at Lorain, Ohio, in charge of an experienced caretaker. Thirteen other vessels were moored in the river at that point, lying both ahead and astern of the Peck, and also on the opposite shore. The Peck's moorings originally consisted of a regular size 1½-inch anchor chain, 75 to 100 feet long, leading forward from the starboard side to a mooring pile planted in solid ground, 12 to 15 feet back from the edge of the water. This pile was of sound white oak, 14 or 15 inches in diameter, and one of a series of like piles placed along the shore for mooring purposes about two years prior to January, 1904. The chain was sunk a foot to 18 inches below the ground and shackled. A second chain led from the stern of the steamer to the shore and made fast.

About 75 or 100 feet astern of the Peck, somewhat around a bend in the river, Dredge No. 8, owned by the appellee, was moored. She was 90 feet

long, 30 feet wide, and drew 5 feet of water. Her forward end was square;' her aft end had something of a fan tail. Upon her forward end a large derrick projected. No criticism is made of her moorings.

The steamer Steinbrenner lay just ahead of the Peck, but somewhat around a bend in the river, thus placing the Peck between Dredge No. 8 and the Steinbrenner, and approximately on a segment of a circle passing through the three vessels. The Nickel Plate railroad bridge is located above where the vessels were moored.

It had been very cold, and the river was frozen over; the ice being from 1 to 2 feet thick. Shortly prior to January 22, 1904, a thaw had set in, with rain. An experienced mariner, who was the acting harbor master, anticipating trouble, went along the river front advising ship keepers to prepare for a possible flood and assisting them to put out additional lines. Two or three additional lines were put out from the dredge and five additional 6-inch lines from the Peck, and made fast to the shore. After the additional lines were put out, the ice above the bridge began to move, carrying with it some scows and dredges. The latter caught upon the bridge; the ice passing under it forming a gorge abreast of the Steinbrenner, and ahead of the Peck. The ice continued to pile up against the scows and dredges that caught against the bridge, until between 8 and 9 o'clock, when they tore away a part of the bridge and passed down the river into the gorge abreast of the Steinbrenner. This gorge soon thereafter began to move down the river, forcing the ice ahead of it and against the bow of the Peck. The additional strain, thus placed on the Peck, came first on her lines, and they parted, thus leaving the strain on the forward chain, which caused the compressor, to which the chain was made fast on the steamer, to slip once or twice, permitting the vessel to surge astern.

At this time the caretaker, who was on the deck of the Peck, adjusting the lines in an effort to equalize the strain, ran below and jumped on the lever, which controlled the compressor and held it fast. With the next pressure of the gorge on the bow of the Peck, the pile to which the forward chain was fastened broke off, and her bow swung out into the river, and she was carried down stream. As she passed the dredge, the after-end of her cabin came in contact with the end of the crane on the dredge, breaking through the Peck's cabin stanchions and throwing a yawl boat resting on a cradle to the deck. The ice gorge, which tore the Peck from her moorings and carried her along, again formed below the bridge at Erie street near the mouth of the river.

When the Peck came in contact with the dredge's crane, the water was not more than 2 feet above normal height; but after the gorge again formed at the mouth of the river, the water above rose rapidly until it was about 6 feet above normal height and upon the embankment above the river. As the water rose, the dredge rose with it. Along the shore, abreast of the dredge, there was a row of old piling, projecting a few feet above the ground, which originally supported a wharf. The water rose above them. When the water began to recede, it was found that the after-end of the starboard side of the dredge was fast upon a pile, throwing her port bow forward into the river, and as the water continued to recede the dredge continued to hang on the pile. There was a hole in the hull of the dredge, and her weight was increased by water which flowed in both through the hole, and also by running over her port bow, until the weight became so great that her lines parted, and she slid into the river and sank. This was between 1 and 2 o'clock in the afternoon, about five hours after the Peck had passed down with the gorge.

Of the 14 or 15 other vessels that were moored in the harbor of Lorain, none escaped damage, except the Steinbrenner. Nine of them were either cast ashore, or torn from their moorings, and carried down the river; all being either destroyed or greatly damaged.

F. S. Laws, of Philadelphia, Pa., and S. A. Hill, of Detroit, Mich., for appellant.

H. D. Goulder and F. S. Masten, both of Cleveland, Ohio, for appellee.

Before WARRINGTON and KNAPPEN, Circuit Judges, and McCALL, District Judge.

McCALL, District Judge (after stating the facts as above). The court below reached the conclusion that the steamer Peck was at fault and decreed accordingly. The Calumet Trust Company, the owner of the Peck, appealed and assigned error.

Judge Day was of the opinion:

"That the Peck broke loose by reason of the compressor slipping and permitting the chain to slack and then tighten, thus breaking or loosening the pile to which the Peck was moored," and that "this was the fault either in the construction of the compressor or more probably in the conduct of the caretaker of the Peck."

If this finding of fact is warranted by the evidence, the appellant was properly adjudged liable for such damages as the appellee sustained, resulting from the Peck's colliding with the dredge, under the rule announced in The Louisiana, 3 Wall. 164, 18 L. Ed. 85, that in a collision caused by a vessel drifting from her moorings she "must be liable for the damages consequent thereon, unless she can show affirmatively that the drifting was the result of inevitable accident or a vis major which human skill or precaution and a proper display of nautical skill could not have prevented." This court has adopted the principle announced in The Louisiana, supra, and applied it in The Wm. E. Reis, 152 Fed. 673, 82 C. C. A. 21, and in Bradley v. Sullivan, 209 Fed. 833, 126 C. C. A. 557.

There was no dispute, therefore, as to the law governing this case; but the appellant stoutly insists that the evidence clearly sustains its defense that the damage sustained by the dredge was the result of inevitable accident or a vis major, and that all was done that human skill or foresight could reasonably suggest to properly moor the Peck and hold her fast, and thus it has brought itself within the rule announced in The Louisiana, supra.

An attentive examination of all the evidence leads us to the conclusion that such contention is not without merit. On January 21st, when it was apparent that a thaw had set in and that there would be a breaking up of the ice, and probably a rise in the river to flood tide, the acting harbor master, an experienced mariner, went to the Peck (as he did to the other vessels in the harbor), and assisted her caretaker, who was also an experienced seaman, to put out five additional 6-inch lines. It was their opinion that the Peck was then properly moored, with sufficient lines to hold her against any condition that under the circumstances might be reasonably anticipated. The additional lines parted when the gorge moved down the river, but the anchor chain held fast. Nor did the compressor, to which it was attached on the boat, break or give way. It slipped once or twice, causing the steamer to lurch. Still the chain held fast, but when the pressure of the ice gorge upon the bow of the steamer became so great that something had to give way, the 15-inch white oak pile, to which she was moored, broke off below the surface of the ground, and the vessel was set adrift. The conditions were very unusual, if not unprecedented, in

the harbor at Lorain on January 22, 1904; for, as has been stated, nine other vessels were either torn from their moorings or cast ashore on the occasion under consideration. If the Peck alone had been swept away, we would be more impressed with the contention of the appellee that there was some negligence or want of nautical skill in her mooring.

While the facts in the cases of The Wm. E. Reis and Bradley v. Sullivan, supra, when considered generally, are very similar to the facts in the instant case, yet they differ in material and important particulars. In the case of The Wm. E. Reis, she had aboard a cargo of 4,800 tons of iron ore, no dock timber or pile gave way, but the lines and cables parted, and, although there were 50 or more vessels moored in the harbor at that time, the Reis was the only one that broke loose and went adrift. In Bradley v. Sullivan, the vessel had a cargo of 70,000 bushels of flax seed aboard; and, though the piles to which she was moored broke off, it was not shown that the flood and floating ice were unprecedented. Furthermore, the conditions prevailing at the time the Alva went adrift, as well as a few hours later, "were anticipated and overcome by those in control of other vessels then moored in neighboring portions of the river and equally exposed." The Alva alone went adrift.

The material distinguishing facts are these: Both the Reis and the Alva had on board large cargoes, and therefore required greater skill and care in mooring. They were the only vessels that went adrift on the respective occasions, thus strongly indicating that the fault was either in the manner of their mooring or handling, while in the instant case the Peck was without cargo and 9 of the 14 craft moored in the harbor at Lorain (including the Peck) either were swept away or cast ashore, and of the remaining 5 all were damaged, except the Steinbrenner. What might have been her fate, had the great pressure of the moving ice gorge come against her bow, is problematical.

The court below found that the drifting of the Peck resulted either from a fault in the construction of her compressor, or in the conduct of her caretaker—more probably the latter. Can it be justly said he was at fault, in that he was unable to adjust the lines about the Peck so as to equalize the strain, and thus have prevented them parting? or that he was at fault in going below to hold the lever to the compressor down? In the light of the wholesale havoc wrought in the port of Lorain, we cannot think the caretaker was guilty of actionable negligence or fault in either instance.

What fault was there in the construction of the compressor? The chain slipped on it once or twice. The caretaker says that was the result of "an extraordinary strain on it." There is no direct evidence touching its construction. That it did not give way, but held the cable firmly, after the first extraordinary strain, until the pile broke off, strongly tends to refute the idea of faulty construction.

We conclude that the evidence proves that appellant did that which careful, prudent, and experienced men would have done under like conditions, that those in charge of her exercised such care and prudence in mooring the Peck as the circumstances reasonably required,

and that her drifting was the result of inevitable accident. The C. H. Northam (D. C.) 181 Fed. 986; Sharpsburg Sand Co. v. Coal & Coke Co. (D. C.) 145 Fed. 424; The Mary J. Robbins (D. C.) 100 Fed. 41; The Waterloo and The Glenalvon, 100 Fed. 332, 40 C. C. A. 386; The Mary L. Cushing (D. C.) 60 Fed. 110.

There are other questions raised, but we deem it unnecessary to discuss them.

It results that the case must be reversed and remanded, with costs, and with direction to dismiss the libel.