## THE CAMPANELLO.

### (District Court, E. D. New York. July 30, 1917.)

COLLISION ⬤⟳22—VESSELS MOORED IN HARBOR.

Libelant's canal boat was lying alongside a steam elevator which in turn was moored to the side of a steamship lying inside the concrete pier which forms the boundary of the Atlantic Basin, when a sudden wind squall struck the bow of the steamship, which extended northward beyond the shed on the pier, causing the parting of the forward lines by which she was moored to the pier and swinging her around, causing injury to the canal boat. The wind was the strongest ever known in New York harbor, having a velocity of 88 miles an hour for five minutes and reaching 125 miles for half a minute. It was seen that a thunderstorm was coming up from the west, but there was nothing to indicate any unusual wind. The steamship was moored to the pier by lines sufficient to hold her in any ordinary or even an extraordinary wind. *Held*, that she was not chargeable with want of reasonable care, and that the injury to libelant's boat must be attributed to inevitable accident for which she was not liable.

In Admiralty. Suit by Christian Hansen against the steamship Campanello. Libel dismissed.

Macklin, Brown & Purdy, of New York City, for libelant.

Barry, Wainwright, Thacher & Symmers, of New York City (Anthony M. Menkel, of New York City, of counsel), for claimant.

CHATFIELD, District Judge. The canal boat Hopkins on July 23, 1914, was lying alongside a steam grain elevator, the International, which in turn was moored to the starboard side of the steamer Campanello. Cargo had been discharged through the elevator into the Hopkins on the afternoon of that day, the Campanello having come in from sea in the morning. Work was stopped at about 5 o'clock in the afternoon. The steamer was lying on the eastern side of the concrete pier or abutment which forms the outside boundary of the Atlantic Basin, in Brooklyn. The bow of the steamer extended to the north about 30 feet beyond the shed or structure which is upon the pier, to a point nearly even with the side wall forming the southerly boundary of the gap into the basin. At about 5 o'clock p. m. one of the strongest windstorms on record in the harbor of New York broke. The rate of wind movement as shown by the weather bureau reached 88 miles for a period of five minutes, from 5:05 to 5:10 p. m. During this five minutes one single mile of wind movement occurred in less than half a minute, or at the rate of 125 miles per hour. It appears that this wind velocity occurred at the outset of a thunder shower, and that thunderheads of the usual form observable in summer had been gathering throughout the afternoon. The conditions were such as to cause expectation of a severe thunderstorm, but there was nothing to indicate the extreme wind velocity which resulted.

The owner and master of the Hopkins testifies that he and his wife anticipated a severe thunder shower, while other of the witnesses for various periods before the storm noticed the weather conditions and knew the storm would break. The barometer had been going down, but did not, of course, record in advance the hurricane velocity which for a few moments made this storm the heaviest the witnesses have ever seen in New York harbor.

The officers of the steamer were aware of the general conditions, but did not anticipate more than the usual severe thunder shower, and did nothing to increase the moorings of the vessel, which were ample, in the opinion of these witnesses, to sustain the vessel in its position under any conditions that might have been expected. When the squall in question struck, it came from the northwest. The gap and the end of the building upon the pier at the south run east and west, and the wind up to this time had been coming from somewhat south of west. Thus until the shifting of the wind the steamer had been protected by the shed, except for a part of her upper deckhouse and bridge. The grain elevator reached fully as high as the structures upon the deck of the steamer, and may have added some surface to that exposed to the wind. The lighter which was moored on the inside and under the lee of the grain elevator received no wind directly. One of the iron mooring bitts upon the concrete abutment, near the stern, was started loose, and the lines running out from the bow of the steamer were parted by the squall, thus allowing the steamer to swing around on her stern lines, carrying the grain elevator and the

lighter with her, and bringing the lighter up on the opposite side of the slip, where she received the damage for which the present action has been brought. The Campanello had out 17 parts of new manila and wire lines.

The only negligence alleged is failure on the part of the officers of the steamer to observe the weather conditions and to anticipate that the moorings of the steamer might not be sufficient to hold her.

The bow of the steamer was higher than the stern, and the sudden shifting of the wind caused a sharp strain upon the lines at the bow, as the wind then suddenly swept straight through the gap against the bow of the steamer, with additional force from conjunction of the air turned away by the end of the shed upon the dock. The force exerted in breaking these lines was evidently much greater than ordinary lines were able to stand. The wind was at the highest strength for less than half a minute. The witnesses describe the shock as almost instantaneous, as a shout to cover the hatches on another vessel was immediately followed by the shift of the wind. The force was delivered like that of a cyclone, at the moment when the wind shifted to the precise point where the bow of the boat was exposed to a gust, that was not reasonably to be anticipated. Ordinary precautions had been taken, and it would seem that these precautions were reasonable as against any thunder shower which should have been anticipated.

It would not be within the requirements of good seamanship to estimate that the hardest squall ever experienced in New York harbor, a change in wind in connection with this squall so as to suddenly present a cyclonic blast against the bow of the boat, and a quick application of strain sufficient to break lines which would hold against even an extraordinary wind should all combine so as to catch the bow of this boat on the small area where it projected beyond the pier shed, and where it would have the greatest leverage if abruptly subjected to a direct wind through the gap. Such an occurrence is an accident, and the failure on the part of the appliances of the vessel to safeguard the vessel against every physical injury does not show lack of care or actionable negligence. Neel v. Blythe (D. C.) 42 Fed. 457; The Olympia (D. C.) 52 Fed. 985.

The cases cited by the libelant, The Louisiana, 70 U. S. (3 Wall.) 164, 18 L. Ed. 85, The Bayonne, 213 Fed. 216, 129 C. C. A. 560, The Drumcraig (D. C.) 133 Fed. 804, and The William E. Reis, 152 Fed. 673, 82 C. C. A. 21, hold that:

"Inevitable accident is something that human skill and foresight could not in the exercise of ordinary prudence have provided against." The Pennsylvania (Union S. S. Co. v. New York & V. S. S. Co.) 65 U. S. (24 How.) 307, 16 L. Ed. 699.

In the absence of any testimony showing failure to use reasonable precautions, the confidence of the captain in the ordinarily safe moorings of his vessel and the testimony that the threatened thunderstorm need not be apprehended in any but the usual manner meet the burden of proof required. The C. H. Northam (D. C.) 181 Fed. 986; The Grace Girdler, 74 U. S. (7 Wall.) 196, 19 L. Ed. 113.

The libel must be dismissed.